## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIANE VACCARO and JENNIFER CHIU, | |
| Plaintiffs, | No. 3:18-cv-11852-FLW-TJB |
| v. | |
| AMAZON.COM.DEDC, LLC. | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## NAMED PLAINTIFF CHIU'S MOTION TO CERTIFY THIS MATTER AS
## A CLASS ACTION PURSUANT TO RULE 23

Matthew D. Miller, Esq.
Joshua S. Boyette, Esq.
Richard S. Swartz, Esq.
Justin L. Swidler, Esq.
**SWARTZ SWIDLER, LLC**
1101 North Kings Highway
Suite 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417
*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ....................................................................................1

I.   STATEMENT OF FACTS IN SUPPORT OF MOTION ..............................3

II.  LEGAL ARGUMENT.........................................................................15

   A.   The Court should Certify the Instant Action as a Class Action pursuant to Rule 23(b)(3) .....................................................................................15

     1.   The Putative Class Satisfies Each Prerequisite for Certification under Rule 23(A) ...........................................................................................17

       a.   Members of the classes are ascertainable ...........................................17

       b.   The Members of the classes are sufficiently numerous that joinder is impracticable ...........................................................................................17

       c.   There are questions of law and fact common to the members of the class 19

       d.   Named Plaintiff's claims are typical of the claims of the members of the class. .................................................................................................20

       e.   Plaintiff will adequately represent the Interest of the Members of the Class. ....................................................................................................21

     2.   The Putative Class Satisfies Each Pre-Requisite for Certification under Rule 23(B)(3).........................................................................................22

       a.   Common issues of law and fact predominate over individual issues with respect to the class..........................................................................23

       b.   The class action method is superior to alternative available methods of adjudication ........................................................................................27

CONCLUSION .......................................................................................28

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Agostino v. Quest Diagnostics, Inc*., 256 F.R.D. 437 (D.N.J. 2009) ......................16

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................... 17, 23

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 689 (1946) .................................26

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ...................................................20

*Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287 (D.N.J. 2007) ...................20

*Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006)........................... 20, 21

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) .............................................26

*Cox v. American Cast Iron Pipe*, 784 F.2d 1546 (11th Cir. 1986).........................18

*Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012) ........................................22

*General Tel. Co. of Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980)......................18

*General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982).............16

*Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018) .............................................23

*Hoxwork v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992) ......................20

*In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305 (3d Cir. 2009).................16

*In re Ins. Brokerage Antitrust Litig*., 579 F.3d 241 (3d Cir. 2009) ........................23

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ....................19

*Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889, *40 (E.D. Pa. 2014)...21

*Kurihara v. Best Buy Co., Inc*., 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. 2007) ..27

*Lindsay v. Gov't Employees Ins. Co*., 251 F.R.D. 51 (D.D.C. 2008) ......................28

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ...............................17

*McLaughlin v. Liberty Mut. Ins. Co*., 224 F.R.D. 304 (D. Mass. 2004).................28

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015).........................25

*Padron v. Feaver*, 180 F.R.D. 448 (S.D. Fla. 1998)..............................................18

*Reinig v. RBS Citizens, N.A.*, 912 F.3d 115 (3d Cir. 2018) ............................. 19, 23

*Sullivan v. DB Inv., Inc.*, 667 F.3d 273 (3d Cir. 2011).............................................19

*Szczubelek v. Cendant Mortgage Corp*., 215 F.R.D. 107 (D.N.J. 2003)................18

*Tyco Labs, Inc. v. Kimball*, 444 F. Supp. 292 (E.D. Pa. 1977) ..............................22

*Vaccaro v. Amazon.com.dedc, LLC*, 2020 WL 3496973 (D.N.J. 2020) .................24

*Vaccaro v. Amazon.com.dedc, LLC*, 2021 WL 1022699, at *4 (D.N.J. 2021) .......24

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2548-49 (2011)................... 15, 16

*Wang v. Chapei LLC*, 2020 WL 468858 (D.N.J. 2020) .........................................26

*Weisfeld v. Sun Chem. Corp*., 210 F.R.D. 136 (D.N.J. 2002) .................................20

*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir. 1975) ...................................21

*Zinberg v. Washington Bancorp, Inc.*, 1385 F.R.D. 397 (D.N.J. 1990) ..................21

## Rules

Fed. R. Civ. P. 23 (a)........................................................................................15

Fed. R. Civ. P. 23 (b)(3).....................................................................................23

Fed. R. Civ. P. 23(a)(1)......................................................................................18

## Other Authorities

Manual for Complex Litigation, Fourth S21.222  (2005) ........................................17

## **INTRODUCTION**

Defendant Amazon, first founded in 1994 as an online bookseller, has become ubiquitous and a household name, now providing a nearly infinite selection of products which can be purchased online and speedily delivered to residences and businesses around the world. A 21st century-update on the mail-order catalog business exemplified one hundred years ago by Sears, Roebuck, and Co., Defendant's core business relies on a vast fulfilment network which employs hundreds of thousands of fulfillment workers at hundreds of facilities around the globe to process and pack the goods Defendant sells to its customers.

Named Plaintiff Chiu ("Named Plaintiff") worked for Defendant as an hourly employee at multiple fulfillment centers operated by Defendant in New Jersey. After completing her work shift, Named Plaintiff clocked out of Defendant's timekeeping system. However, her time under Defendant's control did not cease until Named Plaintiff underwent a Security Screening. Only after undergoing a Security Screening was Named Plaintiff free to exit the fulfillment center. Thousands of other individuals have shared Named Plaintiff's experience as hourly employees working in Defendant's New Jersey fulfillment centers during the period from May 2016 through the present.

Named Plaintiff Chiu[1] seeks certification of the class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of hourly employees working in Defendant's New Jersey fulfilment centers who were required to undergo screenings upon entering or exiting these facilities but who were not paid for this time. Named Plaintiff alleges that Defendant violated the New Jersey Wage and Hour Law ("NJWHL") by failing to all owed overtime wages to her and other hourly fulfillment center employees overtime wages for the time spent having to undergo these screenings.

As set forth in greater detail below, all of the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied. Named Plaintiff's claim for unpaid overtime is typical of the claims of all other New Jersey fulfilment center workers, she is an adequate representative, and she has secured experienced attorney with significant experience litigating wage and hour class and collective actions. The numerosity requirement of Rule 23 is easily met, as the class consists of hundreds if not thousands of fulfilment center workers. Common issues of law and fact unite the class, including the single uniform policy requiring unpaid screenings, as well as the legal issues as to whether such screenings are compensable. With respect to the Rule 23(b)(3)

---

[1] Named Plaintiff Chiu alone moves for class certification and to serve as the representative plaintiff on behalf of the class. Named Plaintiff Vaccaro has not been in communication with undersigned counsel since September 8, 2021 despite undersigned counsel's attempts to contact her. Accordingly, Named Plaintiff Vaccaro is not currently able to serve as a representative plaintiff on behalf of the class, and Named Plaintiff Chiu moves to be the sole representative plaintiff.

prerequisites or predominance and superiority, these prerequisites have been met as well. Accordingly, the Court should grant Plaintiff's motion and certify this matter as a Rule 23(b)(3) class action.

## I.   STATEMENT OF FACTS IN SUPPORT OF MOTION

1.    Named Plaintiff asserts that Defendant violated the NJWHL by uniformly failing to pay overtime wages to Named Plaintiff and all other hourly fulfillment center employees for time spent undergoing Security Screenings and Temperature Screenings. (Doc. No. 58, Second Amended Complaint, ¶¶ 36-52).

2.    During the period from May 2016 through the present (hereinafter the "Relevant Time Period"), Defendant operated fulfillment centers ("FCs") in New Jersey, which numbered between around four (4) and eight (8) at any given time. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 159:17 – 160:7).

3.    During the Relevant Time Period, Defendant operated four (4) types of FCs: 1) robotic sortable, 2) non-sortable, 3) traditional sortable, and 4) cross-dock. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 25:22 – 26:6).

4.    Throughout the Relevant Time Period, Defendant employed hourly employees at its FCs ("FC Workers"). (Ex. B, Tr. of 30(b)(6) designee Stephens 62:8 – 64:6; Ex. D, Nickerson Decl. ¶ 3-5).

5.    As demonstrated herein, throughout the Relevant Time Period, FC Workers were subject to the policies regarding Security Screenings, Temperature

3

Screenings, timekeeping, and the calculation of compensable wages and overtime wages.

6.      During most of the Relevant Time Period (from May 2016 through March 31, 2020), FC Workers punched in and out of Defendant's timekeeping system exclusively through time clocks located in the fulfillment centers. (Ex. B, Tr. of 30(b)(6) designee Stephens 28:2-10; 32:7-8; 53:2-5).

7.      From March 31, 2020 through the present, Defendant permitted FC Workers to punch in and out of its timekeeping system through either the time clocks or through the "Web Punch" function of a smart phone application called "Amazon A to Z." ("A-Z App") (Ex. B, Tr. of 30(b)(6) designee Stephens 28:2-10; 41:6-25; 53:2-5).

8.      To clock in or out with the A-Z App, FC Workers had to be within a certain geographic radius of the fulfillment center where they worked. (Ex. B, Tr. of 30(b)(6) designee Stephens 29:14 – 30:10).

9.      Defendant's timekeeping records show whether a FC Worker clocked in/out with a time clock or the A-Z App. (Ex. B, Tr. of 30(b)(6) designee Stephens 44:14 – 46:4).

10.     Throughout the Relevant Time Period, Defendant determined FC Workers' compensable hours, including overtime hours based on the hours recorded by its timekeeping system. (Ex. B, Tr. of 30(b)(6) designee Stephens 61:23 – 62:20).

## Defendant's Security Screenings

11.    Except as noted below, during the Relevant Time Period, Defendant required FC Workers to undergo a Security Screening after clocking out but before exiting a FC. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 88:10 – 89:9).

12.    On a date in March or April 2020, Defendant suspended Security Screenings at all FCs. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 115:3 – 116:9-24).

13.    Subsequently, Defendant resumed Security Screenings at some of its FCs. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 122:18-25).

14.    The Security Screenings involve a Primary Screening and, under certain circumstances, a Secondary Screening. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 62:9-16).

15.    The Primary Screening involve entering one of multiple lanes, which are separated by stanchions and lead walk-through metal detectors. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 62:9-24).

16.    The lanes at each fulfillment center's Security Screening area include at least one "Express Lane" and at least one "Divesting Lane." (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 67:24 – 68:15).

17.    At least one Divesting Lane at an exit, if there is more than one, serves as the bag check lane, which is manned by a security officer who performs a bag

check on each bag carried by a FC Worker. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 38:2 – 39:17; 63:10-14; 68:24 – 69:25)

18.     An Express Lane consists of only the metal detector and is available for FC Workers who are not carrying bags or other personal items, including keys or change. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 62:21 – 63:1).

19.     FC Workers who passed through the Express Lane's metal detector without setting it off were then free to leave the FC. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 36:15-25).

20.     A Divesting Lane was for employees carrying bags and personal items and required FC Workers to place their belongings on a "slide" before before walking through the metal detector. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 63:2-14).

21.     FC Workers who passed through the Divesting Lane's metal detector without setting it off were then free to leave the FC. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 64:12-16).

22.     During the Relevant Time Period, the number of Security Screening lanes at any given exit at a FC ranged between four (4) and eight (8) or ten (10). (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 141:1-17).

23.     If a FC Worker set off the metal detector during a Primary Screening, Defendant required him or her to undergo a Secondary Screening. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 64:23 – 65:1).

24.     At each Security Screening area in each FC, Defendant designated a single area between the metal detectors and building exits for Secondary Screenings. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 79:12-25).

25.     Upon setting off a metal detector, a FC Worker would walk to the Secondary Screening area to undergo same. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 79:18-25).

26.     The Secondary Screening involves a security officer searching an individual for the source of the metal detection using a handheld metal detector, which was also referred to as a "wand." (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 43:22 – 44:5).

27.     The specific technique used by security officers conducting a Secondary Screening "is an eight-point sweep of the individual with the metal detector no closer than four inches from the individual's body." (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 44:5-9).

28.     If the security officer's wand did not detect anything during the initial sweep, the Secondary Screening was completed, and the FC Worker was free to leave. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 47:10-19).

7

29.    If the security officer's wand detected something, the security officer would ask the FC Worker to remove any object from the area where the detection occurred (e.g., a pocket) or the belt or other visible object that might have been the source of the detection. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 46:21 – 47:2). The security officer would then conduct a second sweep using the wand, and, if the wand detected nothing, the Secondary Screening was completed. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 47:2-9). If the wand instead detected something during the second sweep, the security officer would ask the FC Worker to remove any further objects that might have been the source of the detection. (*Id.*). If, upon a third sweep, the wand detected something, Defendant required the FC Worker to complete a Failure to Clear a Screening form and then the Secondary Screening was completed. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 47:24 – 48:18).

30.    The Security Screening procedures described above, including the Primary Screenings and Secondary Screenings, applied to all FCs from the beginning of the Relevant Time Period until Defendant suspended the Screenings in March or April 2020. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 57:25 – 62:5; 80:25 – 81:12; 107:25 – 109:4).

31.    When Security Screenings resumed, the Primary Screening no longer involved metal detection. Instead, Defendant required FC Workers to walk through metal detectors that Defendant programmed to randomly select individuals—

8

slightly less than 3% of individuals passing through the detectors—to undergo a Secondary Screening. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 126:21 – 127:3; 130:19 – 132:5).

32.     Secondary Screenings now feature a walk-through metal detector instead of a wand wielded by a security officer. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 133:21-25). As with the wand, if a FC Worker triggers the walkthrough metal detector, the FC Worker must divest themselves of any items in their pockets or other object on their body such as a belt that may be triggering the detection and then walk through the detector a second time. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 133:25 – 134:5).

33.     If a FC Worker triggers the metal detector a second time, they are removed to a socially distanced location to complete the Failure to Clear Screening Form. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 134:10-16).

34.     After an individual leaves the Secondary Screening area but before another individual may undergo a Secondary Screening, the attending security officer must disinfect the divesting slide or table if same was used by the prior individual. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 134:6-9).

35.     Defendant now limits the number of individuals who can be in line waiting to undergo a Secondary Screening to two (2) individuals, thus limiting the total number of individuals who could be in the Secondary Screening area to three

9

(3), exclusive of the security officer conducting same. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 133:4-20).

36.     All FCs that have resumed Security Screenings conduct them in the manner described above. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 137:6-22).

37.     While as a technical matter, the A-Z App allowed FC Workers to clock out after completing a Security Screening, at no time did Defendant direct FC Workers to clock out after completing a Security Screening or otherwise after the time they typically clocked out when they used the physical time clocks. (Ex. B, Tr. of 30(b)(6) designee Stephens 85:15-23).

**Defendant's Temperature Screenings**

38.     From the beginning of April 2020 to June 2021, Defendant required each FC Worker to undergo a temperature screening upon entering an FC and prior to beginning work. (Ex. C, Tr. of 30(b)(6) designee Hovde 31:20 – 32:8).

39.     Throughout this period, temperature screenings occurred prior to FC Workers clocking in to Defendant's timekeeping system when they used the physical time clocks. (Ex. B, Tr. of 30(b)(6) designee Stephens 49:4-12; 57:1-21).

40.     While, as a technical matter, the A-Z App allowed FC Workers to clock in prior to entering the FC and undergoing a temperature screening, at no time did Defendant direct FC Workers to clock in before undergoing a temperature screening

or otherwise before the time they typically clocked in when they used the physical time clocks. (Ex. B, Tr. of 30(b)(6) designee Stephens 30:23 – 31:7l 39:23-25).

41.     Initially, Defendant conducted the temperature screenings at all FCs using handheld thermometers. (Ex. C, Tr. of 30(b)(6) designee Hovde 20:15-24).

42.     Undergoing a temperature screening via a handheld thermometer involved a FC Workers walking up to a plastic barrier and placing their temple against a small hole in same. (Ex. C, Tr. of 30(b)(6) designee Hovde 17:12-18).

43.     The screener waiting behind the barrier would then place the handheld thermometer up to the hole and take the FC Worker's temperature. (Ex. C, Tr. of 30(b)(6) designee Hovde 17:18-21).

44.     If the FC Worker's temperature was below 100.4 degrees, the screening would be complete, and the FC Worker would proceed into the building. (Ex. C, Tr. of 30(b)(6) designee Hovde 17:21-25).

45.     If the FC Worker's temperature was 100.4 degrees or greater, the FC Worker would proceed to a secondary screening area where their temperature would be taken again via handheld thermometer. (Ex. C, Tr. of 30(b)(6) designee Hovde 17:23 – 18:2).

46.     If the FC Worker's temperature still was elevated, Defendant sent them home. (Ex. C, Tr. of 30(b)(6) designee Hovde 18:2-7). If the FC Worker's

temperature was less than 100.4 degrees, they could proceed into the building. (Ex. C, Tr. of 30(b)(6) designee Hovde 18:8-9).

47.   During the month of April 2020, Defendant transitioned all FCs to using thermal cameras to conduct temperature screenings. (Ex. C, Tr. of 30(b)(6) designee Hovde 19:10-13).

48.   By the end of April 2020, all FCs used thermal cameras to conduct temperature screenings. (Ex. C, Tr. of 30(b)(6) designee Hovde 19:10-23).

49.   From the end of April 2020 to June 2021, Defendant conducted the temperature screenings at all FCs using thermal cameras. (Ex. C, Tr. of 30(b)(6) designee Hovde 19:10-13; 31:20 – 32:8).

50.   Undergoing a temperature screening via a thermal camera involved FC Workers walking through the designated temperature screening area one-by-one so as to permit the thermal camera to take the temperature of each individual. (Ex. B, Tr. of 30(b)(6) designee Stephens 35:8-25).

51.   As FC Workers passed through a thermal camera's target area, an individual monitoring the temperature readouts would signal to each FC Worker whether they had an elevated temperature. (Ex. C, Tr. of 30(b)(6) designee Hovde 18:10-20) If the thermal camera did not detect an elevated temperature, the FC Worker would be allowed to continue into the FC. (*Id.*).

52.     If a thermal camera detected an elevated temperature for a FC Worker, the FC Worker would undergo a secondary temperature screening, where a handheld thermometer was used. (Ex. C, Tr. of 30(b)(6) designee Hovde 18:21-25).

## Available Time Data

53.     The relevant time data that Defendant recorded during the Relevant Time Period is described herein. Throughout the Relevant Time Period, Defendant recorded the time at which FC Workers clocked in and out of its timekeeping system, whether through Defendant's time clocks or the A-Z App. (Ex. B, Tr. of 30(b)(6) designee Stephens 40:2 – 41:25).

54.     Defendant issued each FC Worker an ID badge, which FC Workers could use to clock in or out at the time clocks located in the FCs. (Ex. B, Tr. of 30(b)(6) designee Stephens 64:12-18; 67:20 – 68:5).

55.     The ID badges issued to FC Workers were unique to each FC Worker, such that the data identifies the FC Worker associated with each swipe of the ID badge. (Ex. B, Tr. of 30(b)(6) designee Stephens 72:25 – 73:17).

56.     Throughout the Relevant Time Period, badge readers located at the entrances and exits of the FCs also recorded the time at which FC Workers entered and exited the FCs. (Ex. B, Tr. of 30(b)(6) designee Stephens 63:19 – 65:10; 68:6-14; 69:17-24).

57.     Defendant also used badge readers to record, *inter alia*, the time at which a FC Worker completed a Secondary Screening throughout the Relevant Time Period at FCs opened after 2014. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 61:14-25).

58.     Defendant installed badge readers in the Secondary Screening areas of FCs built prior to 2014 throughout the Relevant Time Period. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 61:14-18).

59.     From March or April 2020 through the present, every FC used badge readers to record, *inter alia*, the time at which each Secondary Screening of a FC Worker was completed. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 46:12-20).

**Facts Related to Named Plaintiff's Employment**

60.     Named Plaintiff Chiu intermittently worked for Defendant as an hourly FC Associate from as early as in August 2016 to as late as in May 2020. (Ex. E, Named Plaintiff's Pay Records for pay dates September 9, 2016 through December 29, 2017.)

61.     During Named Plaintiff's employment with Defendant as an hourly FC Associate, she worked at multiple FCs, including EWR4 and TEB3. (Ex. F, Named Plaintiff's Punch Origin Report for August 25, 2016 through February 28, 2019; Ex. B, Tr. of 30(b)(6) designee Stephens 42:16 – 43:5; 48:7-12).

14

62.     During Named Plaintiff's periods of employment with Defendant as an hourly FC Associate, she worked more than 40 hours during at least 31 workweeks prior to March 2020. (Ex. E, Pay Records).

63.     Moreover, Named Plaintiff worked more than 40 hours for Defendant during the workweek ending on May 2, 2020. (Ex. G, Pay Stub).

## II.   <u>LEGAL ARGUMENT</u>

### A. <u>The Court should Certify the Instant Action as a Class Action pursuant to Rule 23(b)(3)</u>

Rule 23 of the Federal Rules of Civil Procedure governs a court's consideration of a motion for class certification. To obtain certification, a plaintiff must demonstrate that the putative class meets the threshold requirements of Rule 23(a) as well as one of the three Rule 23(b) categories under which she wishes to proceed on behalf of a class. Fed. R. Civ. P. 23; *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2548-49 (2011). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See Fed. R. Civ. P. 23(a).

Claims for monetary relief are typically certified pursuant to Rule 23(b)(3). *Dukes*, 131 S.Ct. at 2558. Rule 23(b)(3) sets forth two requirements: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Moreover, "[i]t has long been held that Rule 23 implicitly requires that prospective plaintiffs propose a class definition that is readily ascertainable based on objective criteria." *Agostino v. Quest Diagnostics, Inc*., 256 F.R.D. 437, 438 (D.N.J. 2009).

In moving for class certification, a plaintiff has the burden of proving by a preponderance of the evidence that all requirements of Rule 23 are met. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 307 (3d Cir. 2009). The Supreme Court emphasized in *Wal-Mart Stores, Inc. v. Dukes* that Rule 23 does not set forth a mere pleading standard; the plaintiff must in fact prove that the Rule's requirements have been satisfied. *Dukes*, 131 S.Ct. at 2551. In considering a motion for class certification, the court must conduct a rigorous analysis, which will frequently "entail some overlap with the merits of the plaintiff's underlying claims." *Id.*

Named Plaintiff has moved for class certification of her claims under the NJWHL, which permits an employee to recover owed overtime wages.

**1. The Putative Class Satisfies Each Prerequisite for Certification under Rule 23(A)**

**a. <u>Members of the classes are ascertainable</u>**

A class definition must be "precise, objective, and presently ascertainable." Manual for Complex Litigation, Fourth S21.222 at 305 (2005). The Third Circuit has stated that the class must be either identifiable from the defendant's records or ascertainable by some other reliable, administratively feasible, method. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012). Named Plaintiff has proposed a class of all Defendant's hourly fulfillment center employees who worked for Defendant in New Jersey and who, during at least one workweek from two (2) years prior to the original date of the filing of the Complaint through the present, worked at least 40 hours according to Defendant's timekeeping system and underwent a Security Screening or Temperature Screening. The members of this class are ascertainable from Defendant's records. Accordingly, the Court should find that the proposed class is ascertainable.

**b. <u>The Members of the classes are sufficiently numerous that joinder is impracticable</u>**

The first prerequisite a plaintiff must meet under Rule 23(a) is numerosity. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Rule 23(a) requires "the class be so numerous that joinder of all members is impracticable." See Fed. R. Civ.

P. 23(a)(1). This requirement does not demand that joinder be impossible. *Szczubelek v. Cendant Mortgage Corp*., 215 F.R.D. 107, 116 (D.N.J. 2003). Impracticability itself depends on an examination of the specific facts of each case and imposes no absolute numerical limitations. *See General Tel. Co. of Northwest, Inc. v. EEOC*, 446 U.S. 318, 329 (1980). While there is no magic number of class members that is necessary to sustain a class action, as a general rule, a class of forty members or more will typically meet the numerosity requirement. *See, e.g., Cox v. American Cast Iron Pipe*, 784 F.2d 1546, 1553 (11th Cir. 1986); *Padron v. Feaver*, 180 F.R.D. 448 (S.D. Fla. 1998).

Here, the number of class members is in the thousands. On September 4, 2018, Defendant filed the Declaration of Peter Nickerson in support of its opposition to the motion to remand. (Ex. D). Nickerson's review of Defendant's payroll data for individuals employed as Fulfillment Center Associates in New Jersey from May 11, 2016 through August 27, 2018 revealed that such individuals worked a total of 131,823 bi-weekly pay periods during which the employee worked at least 40 hours in each workweek. (Ex. D, Nickerson Decl. ¶ 7). Nickerson's review further revealed that in 184,588 additional bi-weekly pay periods, the employee worked at least 40 hours in one of the two workweeks. (*Id.* ¶ 8). As period examined by Nickerson covers only 119 weeks, more than 2,200 individuals would be required to work just

the 131,823 bi-weekly periods referenced above (131,823 bi-weekly pay periods * 2 = 263,646 workweeks;  263,646 / 119 = 2,215.5).

Accordingly, the Court should find that the proposed class satisfies the numerosity prong.

### c. There are questions of law and fact common to the members of the class

To certify a class under Rule 23(a), there must exist questions of law and fact common to the members of class. To certify the proposed classes under Rule 23(b)(3), Plaintiff must establish that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The Third Circuit has "held that Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is 'far more demanding than the latter.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)). "[T]he 'predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members.'" *Id.* (quoting *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011)).

As explained in detail below, common issues of fact predominate over individual issues under Rule 23(b)(3), thereby also satisfying Rule 23(a)'s more lenient commonality requirement.

### d.  <u>Named Plaintiff's claims are typical of the claims of the members of the class.</u>

Named Plaintiff's claims are typical of the claims of the class. A claim is typical under Rule 23(a)(3) if it "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (quoting *Hoxwork v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992). The threshold for satisfying the typicality requirement is low. *Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287, 292 (D.N.J. 2007). The court answers this question by asking **not** whether the *plaintiff* is typical but whether the plaintiff's *claims* are typical, in common-sense terms, of the class member's claims, thereby suggesting that the plaintiff's incentives aligned with rather than conflict with those of the class. *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). "In instances where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 140 (D.N.J. 2002).

Named Plaintiff was an hourly fulfillment center employee subject to Defendant's Security Screening and Temperature Screening policies. She seeks to represent a class that includes all hourly fulfillment center employees who worked in New Jersey, who were subject to the same policies. Named Plaintiff satisfies the

typicality requirement because her claims—violations of the NJWHL for unpaid Security Screenings and Temperature Screenings—are identical to the claims of the class. *See Beck*, 457 F.3d at 295-96. Named Plaintiff was harmed in the same way and her claims are based on the same legal theory as all other members of the class. *See Zinberg v. Washington Bancorp, Inc.*, 1385 F.R.D. 397, 407 (D.N.J. 1990). Accordingly, Named Plaintiff's proposed class also satisfies the typicality prong.

### e. Plaintiff will adequately represent the Interest of the Members of the Class.

In the Third Circuit, courts look to two elements to assess the adequacy of class representation under Rule 23(a)(4): "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625 (internal citations omitted).

Named Plaintiff satisfies the first element of the adequacy test because Named Plaintiff's counsel has substantial experience litigating complex actions, including class actions and certified collective actions with tens of thousands of class members alleging wage and hour violations. Declaration of Justin L. Swidler, Esq.; s*ee also Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889, *40 (E.D. Pa. 2014) (finding that Mr. Swartz has "considerable experience handling class and collective

action disputes" and noting that he has "represented the Named Plaintiffs and the prospective class [of 25,000] competently, diligently, and with professionalism throughout the course of this litigation").

The test for the second element is whether the proposed representatives have conflicts that make it likely that the class members' interests will be disregarded. *Tyco Labs, Inc. v. Kimball*, 444 F. Supp. 292, 299 (E.D. Pa. 1977). "The linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen AG*, 681 F.3d 170, 183 (3d Cir. 2012). Here, Named Plaintiff suffered the same type of injury as the absent class members; accordingly, the interests of Named Plaintiff is aligned with the class.

Accordingly, the Court should find that Named Plaintiff has satisfied the adequacy prerequisite.

## 2.  The Putative Class Satisfies Each Pre-Requisite for Certification under Rule 23(B)(3)

Rule 23(b)(3) sets forth two additional requirements to class certification: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Fed. R. Civ. P. 23 (b)(3). For the following reasons, the proposed class also satisfies these pre-requisites.

### a. <u>Common issues of law and fact predominate over individual issues with respect to the class</u>

To be certified under Rule 23(b)(3), common issues must predominate over individual issues. The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *In re Ins. Brokerage Antitrust Litig*., 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem*, 521 U.S. at 623-24). Predominance is satisfied "only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig*, 912 F.3d at 127-28 (quoting *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018)). "In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which the plaintiffs propose to use the evidence to prove' those elements." *Id.* (quoting *Marcus*, 687 F.3d at 600).

Here, common issues of law and fact predominate with respect to Named Plaintiff's NJWHL claims for unpaid overtime wages. Named Plaintiff's claims involve a challenge to the lawfulness of Defendant's uniform treatment of the time spent by Named Plaintiff and FC Workers between clocking out of Defendant's

timekeeping system and completing a Security Screening and between undergoing a Temperature Screening and clocking in to the timekeeping system as not compensable time under the NJWHL. To prove these claims, Named Plaintiff must demonstrate that Defendant required each FC Worker to undergo Security Screenings and that Defendant did not pay the FC Worker overtime wages for the time that elapsed between each FC Worker clocking out of Defendant's timekeeping system and completing the Security Screening at which time they then free to spend time predominately for their own benefit. *Vaccaro v. Amazon.com.dedc, LLC*, 2020 WL 3496973, at *4 (D.N.J. 2020). Named Plaintiff must demonstrate the same for the Temperature Screening time—the Defendant required FC Workers to undergo Temperature Screenings and did not pay them overtime wages for the time that elapsed between each FC Worker undergoing a Temperature Screening and clocking in to the timekeeping system. Named Plaintiff must further demonstrate that the time spent undergoing a Temperature Screening predominately benefitted Defendant, which is a legal question common to all FC Workers. *Vaccaro v. Amazon.com.dedc, LLC*, 2021 WL 1022699, at *4 (D.N.J. 2021).

Named Plaintiff has further demonstrated that facts common to her and the FC Workers prove the elements of her claim. The record before the Court shows that Defendant required all FC Workers to undergo a Security Screening at the end of each work shift during the time between May 2016 and March or April 2020 and

24

then at some point thereafter at some FCs. See Statement of Facts ("SOF") at ¶¶ 11-

13. The record also shows that every FC Worker must walk from the time clock to

the Security Screening area to complete a Security Screening. (See SOF at ¶¶ 14-

21). In every workweek in which a FC Worker worked at least 40 hours according

to Defendant's timekeeping system, Defendant admits that it did not consider the

time spent between clocking out and completing a Security Screening, no matter

how short in duration, as compensable overtime. (See Doc. No. 62, Answer to

Second Amended Complaint, at ¶¶ 36-37, 40). The record also demonstrates that,

from the beginning of April 2020 to June 2021, Defendant required FC Workers to

undergo Temperature Screenings at the beginning of their shifts prior to clocking in,

time which Defendant similarly did not consider compensable time. (See SOF at ¶¶

38-40; Doc. No 62, Answer, at ¶ 51).

     Though a small amount of variation exists in the duration of each period of

unpaid time for a FC Worker undergoing a Security Screening or Temperature

Screening due to, *inter alia*, walking speed, whether the employee had to wait in a

line, the type of lane used (i.e., Express Lane, Divesting Lane, etc.), and whether the

FC Worker had to undergo a Secondary Screening that variation bears only on

damages owed to each FC Worker and do not preclude class certification under Rule

23(b)(3). *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375-75 (3d Cir.

2015) ("'Recognition that individual damages calculations do not preclude class

certification under Rule 23(b)(3) is well nigh universal.'" (quoting *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1437 (2013) (Ginsburg, J. and Breyer, J., dissenting)).

Moreover, even this variation will not create the need for any significant individualized analysis, because Defendant did not maintain exact records of the time employees spent undergoing Security Screenings and Temperature Screenings but did record the time class members clocked out for compensation purposes and the time that employees entered or exited a fulfillment center. (See SOF at ¶¶ 53-59). While not perfect, these records are more than sufficient to prove damages based on the burden-shifting standard set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 689, 686-88 (1946), which courts have adopted in cases involving NJWHL overtime claims. *See, e.g., Wang v. Chapei LLC*, 2020 WL 468858, at *7 (D.N.J. Jan. 29, 2020) (J., Shipp).

Finally, predominance does not require that there be no individualized issues, only that the common issues, provable with common proof and yielding common class-wide answers outweigh such individual issues. Here, the central issue of the compensability of this time is the predominating issue in this case, and this issue turns solely on the common class-wide evidence and analysis.

Where courts have found a systematic failure to pay owed overtime, they have had little difficulty finding that the predominance requirement is satisfied. *See, e.g., Kurihara v. Best Buy Co., Inc*., 2007 U.S. Dist. LEXIS 64224, at *6 (N.D. Cal.

2007). And of course, to the extent that the Court finds that Defendant did not have to pay for these screenings, that conclusion will resolve, at a stroke, the claims of all class members.

Accordingly, the Court should find that the class satisfies the predominance requirement as well.

### b. The class action method is superior to alternative available methods of adjudication

The final prerequisite for class certification is that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23 (b)(3). The Rule identifies the following factors pertinent to such a finding: (1) the interest of individual class members in individually controlling the prosecution of separate actions; (2) the extent and nature of any previously commenced litigation concerning the controversy; (3) the desirability or undesirability of concentrating the litigation of the claims in a single forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id*.

In evaluating the first factor, the court should review the interests each class member may have in the litigation. Typically, courts review the potential damages of each class member; here, the damages owed likely are to be too low to justify individual litigation and would certainly result in litigation expenses far outweighing the amount of damages. Moreover, courts around the country have routinely certified Rule 23 classes for wage and hour disputes. *See, e.g., Lindsay v. Gov't Employees*

*Ins. Co.*, 251 F.R.D. 51 (D.D.C. 2008); *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304 (D. Mass. 2004).

Here, where the amount of damages is prohibitively low compared to maintaining an individual action, the Court should find that a class action is the superior method of adjudication of the instant claim.

## CONCLUSION

For the foregoing reasons, Named Plaintiff respectfully requests that this Honorable Court grant the instant motion.

Respectfully Submitted,

*/s/ Matthew D. Miller*
Matthew D. Miller, Esq.
Joshua S. Boyette, Esq.
Justin L. Swidler, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy. N., Suite 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417

Date: November 12, 2021

28