# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIANE VACCARO and JENNIFER CHIU, | |
| Plaintiffs, | No. 3:18-cv-11852-GC-TJB |
| v. | |
| AMAZON.COM.DEDC, LLC. | |
| Defendant. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## NAMED PLAINTIFF CHIU'S RENEWED MOTION TO CERTIFY THIS
## MATTER AS A CLASS ACTION PURSUANT TO RULE 23

Matthew D. Miller, Esq.
Joshua S. Boyette, Esq.
Richard S. Swartz, Esq.
Justin L. Swidler, Esq.
**SWARTZ SWIDLER, LLC**
9 Tanner Street, Suite 101
Haddonfield, NJ 08033
Phone: (856) 685-7420
Fax: (856) 685-7417
*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ........................................................................1

   I.   STATEMENT OF FACTS IN SUPPORT OF MOTION ............................3

   II.  LEGAL ARGUMENT.................................................................12

     A.  The Court should Certify the Instant Action as a Class Action pursuant to Rule 23(b)(3) .................................................................12

      1.  Plaintiff Chiu has Established Each Prerequisite for Certification under Rule 23(A) .................................................................14

        a.  Members of the class are ascertainable ...............................14

        b.  The Members of the class are sufficiently numerous that joinder is impracticable. ..........................................................15

        c.  There are questions of law and fact common to the members of the class .....................................................................16

        d.  Named Plaintiff's claims are typical of the claims of the members of the class. ..........................................................17

        e.  Plaintiff will adequately represent the Interest of the Members of the Class. ..........................................................19

      2.  The Putative Class Satisfies Each Pre-Requisite for Certification under Rule 23(B)(3).................................................................21

        a.  Common issues of law and fact predominate over individual issues with respect to the class...............................................21

        b.  The class action method is superior to alternative available methods of adjudication .........................................................28

CONCLUSION ..........................................................................30

## TABLE OF AUTHORITIES

### Cases

*Agostino v. Quest Diagnostics, Inc*., 256 F.R.D. 437 (D.N.J. 2009) ......................14

*Alfonso v. FedEx Ground Package Sys.*, 2024 U.S. Dist. LEXIS 40928 (D. Conn. Mar. 8, 2024) ............................................................................................ 30, 31

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)............................... 15, 20, 23

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 689 (1946)...................................29

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ....................................................18

*Barr v. Harrah's Entertainment, Inc.*, 242 F.R.D. 287 (D.N.J. 2007) ...................19

*Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006)........................... 19, 20

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .........................................................34

*Davis v. Target Corp.*, 2023 U.S. Dist. LEXIS 214818 (E.D. Pa. Dec. 1, 2023)....30

*Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012) ........................................22

*Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884 (N.D. Cal. 2015) ........................33

*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (U.S. 1982)................ 12-13

*Hargrove v. Sleepy's LLC*, No. 22-2040, 2023 U.S. App. LEXIS 14553 (3d Cir. June 12, 2023).................................................................................. 24, 25, 27, 28

*Hoxwork v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992)......................19

*Huber v. Simon's Agency, Inc.*, 84 F.4th 132 (3d Cir. 2023) .................................24

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009)........... 13, 23

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ........................23

*In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016) .................................16

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) ............................................................................24

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .............. 18, 33

*Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889 (E.D. Pa. 2014)...........21

*Kurihara v. Best Buy Co.*, 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. Aug. 29, 2007) ...................................................................................................................31

*Lao v. H&M Hennes & Mauritz, L.P.*, 2018 U.S. Dist. LEXIS 133969 (N.D. Cal. Aug. 8, 2018) ...................................................................................................30

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ..............................15

*McGee v. Anne's Choice, Inc.*, 2014 U.S. Dist. LEXIS 75840 (E.D. Pa. 2014) .....21

*Monroe v. FTS USA, LLC*,  860 F.3d 389 (6th Cir. 2017)......................................30

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590 (C.D. Cal. 2015) ................................................................................................................25

*Morgan v. Family Dollar Stores,* 551 F.3d 1233 (11th Cir. 2008)..........................30

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015)........................28

*Reinig v. RBS Citizens, N.A.*, 912 F.3d 115 (3d Cir. 2018) ...................................18

*Reyes v. Netdeposit, LLC,* 802 F.3d 469 (3d Cir. 2015) ........................................17

*Rivet v. Office Depot, Inc.,* 207 F. Supp. 3d 417 (D.N.J. 2016) ..............................25

*Salinas v. U.S. Xpress, Inc.,* 2018 WL 1477127 (E.D. Tenn. 2018) ......................22

*Senne v. Kansas City Royals Baseball Corp.,* 934 F.3d 918 (9th Cir. 2019) ..........25

*Sullivan v. DB Inv., Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................................18

*Tyco Labs, Inc. v. Kimball*, 444 F. Supp. 292 (E.D. Pa. 1977) ...............................22

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 460 (2016) .................................29

*Univ. of P.R. Ret. Sys. v. Lannett Co.,* No. 21-3150, 2023 U.S. App. LEXIS 9143
    (3d Cir. Apr. 18, 2023) ........................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2548-49 (2011)...........................13

*Weisfeld v. Sun Chem. Corp*., 210 F.R.D. 136 (D.N.J. 2002) .................................19

*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir. 1975) .................................20

*Zinberg v. Washington Bancorp, Inc.*, 1385 F.R.D. 397 (D.N.J. 1990) .................20

**Rules**

Fed. R. Civ. P. 23 (a)......................................................................................... 12, 14

Fed. R. Civ. P. 23 (b)(3).........................................................................................23

**Other Authorities**

Manual for Complex Litigation, Fourth S21.222  (2005) ........................................14

# INTRODUCTION

Named Plaintiff Chiu worked as an hourly employee at multiple Amazon fulfillment centers in New Jersey, and, like every fulfillment center employer in New Jersey, was required to spend time after clocking out of Defendant's timekeeping system undergoing security screenings before she was permitted to exit Defendant's premises. Defendant Amazon.com Services LLC ("Amazon") admits it did not consider the time spent between clocking out and undergoing a Security Screening compensable and did not pay its hourly workers for this time. Named Plaintiff alleges this policy is unlawful under the New Jersey Wage and Hour Law ("NJWHL") and resulted in Amazon failing to pay her all overtime wages due. Because this policy was applied to all of Amazon's hourly fulfillment center employees in New Jersey, she now seeks to certify this matter as a class action pursuant to Fed. R. Civ. P. 23(b) on behalf of:

> All Defendant's hourly fulfillment center employees who worked in New Jersey and who, during at least one workweek from May 11, 2016 (two (2) years prior to the original date of the filing of the Complaint) through the present, worked at least 40 hours during a workweek according to Defendant's timekeeping system.

At this stage, the Court's sole focus is whether the prerequisites for class certification under Rule 23 have been satisfied, not whether the class will ultimately succeed on the merits. Therefore, the Court's inquiry is limited to whether resolving Named Plaintiff's overtime claims will involve common evidence and legal theories

1

that apply class-wide across the multiple fulfillment centers where the putative class members worked.

Here, Rule 23 class certification is appropriate because whether Amazon was required under the NWJHL to pay for the time spent after clocking-out and undergoing security screening is a single, common, predominating question whose answer will determine liability as to the entire class. Amazon admits it applied a uniform policy to all fulfillment center workers, regardless of location, requiring them to undergo mandatory security screenings after clocking out, and it categorically excluded the time spent in these screenings from the overtime wages owed to these workers. Amazon admits that its uniform and official timekeeping and payroll policies failed to provide even a single cent of overtime wages for this time, no matter how long in duration, to any worker, including in workweeks where the worker already logged more than 40 hours.

To establish Amazon's liability, Named Plaintiff will rely on class-wide evidence as to the existence of the policy, such as policy documents and corporate designee depositions. The arguments for and against liability are class-wide arguments which apply uniform uniformly to all class members' claims. Damages can be proven on a class-wide basis with Amazon's time records and representative evidence.

Named Plaintiff also satisfies the remaining prerequisite for Rule 23(b)(3) certification. Her claim is typical of the claims of all other fulfillment center workers, and she will adequately represent the interests of the class. Moreover, given the number of class members, size of their individual claims, and the overwhelming efficiency of trying these claims together as a class, the class action is also superior to any other method for fairly and efficiently adjudicating these claims.

For these reasons, Named Plaintiff respectfully requests that the Court grant this motion and certify the class, allowing this matter to proceed as a class action and providing a path to relief for the thousands of workers denied the overtime pay guaranteed to them by law.

## I.    STATEMENT OF FACTS IN SUPPORT OF MOTION

1.    Named Plaintiff asserts Amazon violated the NJWHL by failing to pay overtime wages to Named Plaintiff and all other hourly fulfillment center employees for time spent undergoing mandatory Security Screenings, which Amazon uniformly required at all its facilities. (Doc. No. 58, Second Amended Complaint, ¶¶ 36-41).

2.    During the period from May 2016 through the present (hereinafter the "Relevant Period"), Amazon operated fulfillment centers ("FCs") in New Jersey, numbering between around four (4) and eight (8) at any given time. (Ex. A, Tr. of 30(b)(6) designee Gilbert-Differ 159:17 – 160:7).

3.      Throughout the Relevant Period, Amazon employed hourly employees at its FCs ("FC Workers"). (Ex. B, Tr. of 30(b)(6) designee Stephens 62:8-20; Ex. C, Nickerson Decl. ¶ 3-5).

4.      As demonstrated herein, throughout the Relevant Period, Amazon subjected FC Workers to its policies regarding Security Screenings, timekeeping, and the calculation of compensable wages and overtime wages. *See* instant Statement of Facts, *infra,* at ¶¶ 6-8, 10-12, 13-40.

5.      During the first half of the Relevant Period (from May 2016 through March 31, 2020), FC Workers punched out of Amazon's timekeeping system exclusively through time clocks located in the FCs. (Ex. B, Tr. Stephens 28:2-10; 32:4-9; 53:2-5).

6.      From March 31, 2020 through the present, Amazon expanded the methods through which FC Workers could clock out to include the "Web Punch" function of a smart phone application called "Amazon A to Z." ("A-Z App") (Ex. B, Tr. Stephens 28:2-10; 41:6-25; 53:2-5).

7.      Nevertheless, even after Amazon permitted FC Workers to use the A-Z App to clock out instead of using the physical time clocks, Amazon still required FC workers to "pass through security **after** clocking out at the end of their shift." Def. Answer to Second Amended Compl. at ¶ 37 (ECF Doc. 62) (May 3, 2021) (emphasis added).

8.      Amazon's timekeeping records show whether an FC Worker clocked out with a time clock or the A-Z App. (Ex. B, Tr. Stephens 44:14 – 46:4).

9.      If an FC Worker clocked out via time clock, Amazon's records identify which time clock was used. (Ex. B, Tr. Stephens 45:20 – 46:4).

10.     Throughout the Relevant Period, Amazon calculated FC Workers' compensable hours, including overtime hours, based solely on the hours recorded in its timekeeping system. (Ex. B, Tr. Stephens 61:23 – 62:20).

11.     Amazon admits it did not consider the time spent between clocking out and completing a Security Screening compensable and that it did not pay its hourly workers for this time. Def. Answer to Second Amended Complaint, ECF Doc. No. 62 at ¶¶ 36-37, 40.

### Amazon's Security Screenings

12.     Except as noted below and during fire alarms, during the Relevant Period, Amazon uniformly required FC Workers to undergo a Security Screening after clocking out but before exiting the FC. (Ex. A, Tr. Gilbert-Differ 88:10 – 89:9).

13.     In March or April of 2020, during the beginning of the COVID-19 Pandemic, Amazon temporarily suspended Security Screenings at all FCs. (Ex. A, Tr. Gilbert-Differ 115:3 – 116:24).

14.     Subsequently, Amazon resumed Security Screenings in at least some of its FCs. (Ex. A, Tr. Gilbert-Differ 122:18-25).

5

15.    Amazon's Security Screening policy mandated that FC Workers complete a Primary Screening and, in certain circumstances, an additional Secondary Screening. (Ex. A, Tr. Gilbert-Differ 36:15-25; 62:9-16).

16.    The Primary Screening process was substantially identical in all FC facilities, requiring FC Workers to enter one of multiple lanes, which are separated by stanchions and lead to walk-through metal detectors. (Ex. A, Tr. Gilbert-Differ 62:9 – 63:14).

17.    Every FC had at least one "Express Lane" and one "Divesting Lane/Bag Lane" at each Security Screening area. (Ex. A, Tr. Gilbert-Differ 67:24 – 68:15).

18.    In the Divesting Lane(s) in each FC, a security officer conducted a mandatory bag check on every bag carried by an FC Worker. (Ex. A, Tr. Gilbert-Differ 38:2 – 39:17; 63:10-14; 68:24 – 69:25)

19.    The Express Lane, used by FC Workers without bags or personal items, including keys or change, contained a metal detector that workers were required to pass through before they could leave the FC. (Ex. A, Tr. Gilbert-Differ 62:21 – 63:1).

20.    FC Workers in the Express Lane could not exit the FC until successfully passing through the metal detector without setting it off. (Ex. A, Gilbert-Differ 36:15-25).

21.    The Divesting Lane was for employees carrying bags and personal items and required FC Workers to place their belongings on a "slide" before walking through the metal detector. (Ex. A, Gilbert-Differ 63:1-14).

22.    Amazon does not permit the FC Workers in the Divesting Lane to leave the FC until they pass the metal detector without setting it off. (Ex. A, Tr. Gilbert-Differ 64:12-16).

23.    During the Relevant Period, the number of Security Screening lanes at any given exit at an FC ranged between four (4) and eight (8) or ten (10). (Ex. A, Tr. Gilbert-Differ 141:1-17).

24.    If an FC Worker set off the metal detector during a Primary Screening, Amazon required him or her to undergo a Secondary Screening. (Ex. A, Tr. Gilbert-Differ 41:16 – 42:5; 64:23 – 65:1).

25.    At each Security Screening area in each FC, Amazon designated an area between the metal detectors and building exits for Secondary Screenings. (Ex. A, Tr. Gilbert-Differ 79:12-25).

26.    Amazon required every FC Worker who triggered the metal detector to walk to the designated Secondary Screening area and remain in the FC to undergo a Secondary Screening. (Ex. A, Tr. Gilbert-Differ 79:18-25).

27.    The Secondary Screening involves a security officer searching an FC Worker for the source of the detected metal using a handheld metal detector, which was also referred to as a "wand." (Ex. A, Tr. Gilbert-Differ 43:22 – 44:5).

28.    If an FC Worker had a bag, Amazon required the FC Worker to permit the security officer conducting the Secondary Screening to search the bag as part of the Secondary Screening. (*Id.* at 44:16-19.)

29.    The Secondary Screening procedure was uniformly applied across all FCs, with the security officer performing an eight-point sweep of the individual with a handheld metal detector ("wand") "no closer than four inches from the individual's body." (*Id.* at 44:5-15).

30.    If the first sweep of the Secondary Screening was clear, only then was the FC Worker permitted to leave the FC. Any alarm required further screening. (Ex. A, Tr. Gilbert-Differ 47:10-19).

31.    If the security officer's wand detected something, the security officer would ask the FC Worker to remove any object from the area where the detection occurred (e.g., a pocket) or the belt or other visible object that might have been the source of the detection. (Ex. A, Tr. Gilbert-Differ 46:21 – 47:2). The security officer would then conduct a second sweep using the wand, and, if the wand detected nothing, the Secondary Screening was completed. (Ex. A, Tr. Gilbert-Differ 47:2-9).

32.     If the wand instead detected something during the second sweep, the security officer would ask the FC Worker to remove any further objects that might have been the source of the detection. (*Id.*).

33.     If, upon a third sweep, the wand detected something, Amazon required the FC Worker to complete a Failure to Clear a Screening form and then the Secondary Screening was completed. (Ex. A, Tr. Gilbert-Differ 47:24 – 48:21).

34.     The Security Screening procedures described above, including the Primary Screenings and Secondary Screenings, applied to all FCs from the beginning of the Relevant Period until Amazon temporarily suspended the Screenings in March or April 2020. (Ex. A, Tr. Gilbert-Differ 57:25 – 62:5; 80:25 – 81:12; 107:25 – 109:4).

35.     When Security Screenings resumed, the Primary Screening no longer involved metal detection. Instead, Amazon required FC Workers to walk through detectors that Amazon programmed to randomly select individuals—slightly less than 3%—to undergo a Secondary Screening. (Ex. A, Tr. Gilbert-Differ 126:21 – 127:3; 130:19 – 132:5).

36.     Under the new policy, Secondary Screenings still involve a search of the FC Worker and their belongings but utilize a walk-through metal detector in place of the handheld wand. (Ex. A, Tr. Gilbert-Differ 133:21-25). Just as before, the modified Secondary Screening requires FC Workers to divest personal items and

9

submit to additional screening if the metal detector is triggered. (Ex. A, Tr. Gilbert-Differ 133:25 – 134:5).

37.    Under the new policy, Amazon still requires FC Worker who trigger the metal detector a second time to go to another location in the FC to complete the Failure to Clear Screening Form. (Ex. A, Tr. Gilbert-Differ 134:10-16).

38.    After an individual leaves the Secondary Screening area but before another individual may undergo a Secondary Screening, the attending security officer must disinfect the divesting slide or table if same was used by the prior individual. (Ex. A, Tr. Gilbert-Differ 134:6-9).

39.    All FCs that resumed Security Screenings conduct them in the manner described above. (Ex. A, Tr. Gilbert-Differ 137:6-22).

## **Available Time Data**

40.    Throughout the Relevant Period, Amazon recorded the time at which FC Workers clocked out of its timekeeping system, whether through Amazon's time clocks or the A-Z App. (Ex. B, Tr. Stephens 40:2 – 41:25).

41.    Amazon issued each FC Worker an ID badge, which FC Workers could use to clock out at the time clocks located in the FCs. (Ex. B, Tr. Stephens 64:12-18; 67:20 – 68:5).

42.    The ID badges issued to FC Workers were unique to each FC Worker, such that the data identifies the FC Worker associated with each swipe of the ID badge. (Ex. B, Tr. Stephens 72:25 – 73:17).

43.    Throughout the Relevant Period, badge readers located at the exits of the FCs also recorded the time at which FC Workers exited the FCs. (Ex. B, Tr. Stephens 63:19 – 65:10; 68:6-14; 69:17-24).

44.    Amazon also used badge readers to record, *inter alia*, the time at which a FC Worker completed a Secondary Screening throughout the Relevant Period at FCs opened after 2014. (Ex. A, Tr. Gilbert-Differ 61:14-25).

45.    Amazon installed badge readers in the Secondary Screening areas of FCs built prior to 2014 throughout the Relevant Period. (Ex. A, Tr. Gilbert-Differ 61:14-18).

46.    From March or April 2020 through the present, every FC used badge readers to record, *inter alia*, the time at which each Secondary Screening of a FC Worker was completed. (Ex. A, Tr. Gilbert-Differ 46:12-20).

## **Facts Related to Named Plaintiff's Employment**

47.    Named Plaintiff Chiu intermittently worked for Amazon as an FC Worker from as early as August 2016 to as late as May 2020. (Ex. D, Named Plaintiff's Pay Records for pay dates September 9, 2016 through December 29, 2017; Ex. E, Time Records, Ex. F. May 18, 2020 Pay Stub.)

11

48.     During Named Plaintiff's employment with Amazon as an FC Worker, she worked at multiple FCs, including EWR4 (in Robbinsville, New Jersey) and TEB3 (Logan Township, New Jersey). (Ex. E, Named Plaintiff's Punch Origin Report for August 25, 2016 through February 28, 2019; Ex. B, Tr. Stephens 42:16 – 43:5; 48:7-12).

49.     During Named Plaintiff's periods of employment with Amazon as an FC Worker, she worked more than 40 hours during at least 31 workweeks during the Relevant Period. (Ex. D, Pay Records).

## II.    <u>LEGAL ARGUMENT</u>

### A. <u>The Court should Certify the Instant Action as a Class Action pursuant to Rule 23(b)(3)</u>

Rule 23 of the Federal Rules of Civil Procedure governs a district court's consideration of a motion for class certification. A district court considering a motion for class certification must undertake "a rigorous analysis" to ensure that the requirements of Rule 23(a) are met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982).  If all the requirements are met, the court must then determine if the class is permissible under *any* subset of Rule 23(b).  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008). In moving for class certification, the plaintiff has the burden of proving by a preponderance of the evidence that all requirements of Rule 23 are met. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305,

307 (3d Cir. 2009). In determining whether to certify a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *In re Hydrogen Peroxide*, 552 F.3d at 318.

Named Plaintiff has moved for Rule 23(b)(3) class certification of her claims under the NJWHL, which permits an employee to recover owed overtime wages. To obtain certification, Named Plaintiff must demonstrate that the putative class meets the threshold requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3). Fed. R. Civ. P. 23; *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2548-49 (2011). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See Fed. R. Civ. P. 23(a). As set forth below, Named Plaintiff has established each of these elements. Moreover, prospective representative plaintiffs also must propose a class definition that is "readily ascertainable based on objective criteria." *Agostino v. Quest Diagnostics, Inc.*, 256 F.R.D. 437, 438 (D.N.J. 2009). Here, too, Named Plaintiff has proposed an ascertainable and objective class definition.

Rule 23(b)(3) sets forth two additional requirements: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Here, as set forth below, Named Plaintiff also has established predominance and superiority. Accordingly, because all the prerequisites to Rule 23(b)(3) certification have been satisfied, the Court should certify the class.

## 1. Plaintiff Chiu has Established Each Prerequisite for Certification under Rule 23(A)

### a. Members of the class are ascertainable

A class definition must be "precise, objective, and presently ascertainable." Manual for Complex Litigation, Fourth S21.222 at 305 (2005). To satisfy this requirement, the class must be either identifiable from the defendant's records or ascertainable by some other reliable, administratively feasible, method. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012).

Named Plaintiff has moved to certify a class of "all Defendant's hourly fulfillment center employees who worked for Defendant in New Jersey and who, during at least one workweek from May 11, 2016 (two (2) years prior to the original date of the filing of the Complaint) through the present, worked at least 40 hours in a workweek according to Defendant's timekeeping system." The members of this class are ascertainable from Amazon's records. *See* Statement of Facts ("SOF") at ¶¶ 40-46. Accordingly, the Court should find that the proposed class is ascertainable.

14

b. <u>The members of the class are sufficiently numerous that joinder is impracticable</u>

The first prerequisite a plaintiff must meet under Rule 23(a) is numerosity. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). This requirement is met where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While there is no magic number of class members that is necessary to sustain a class action, a class of forty members or more will typically meet the numerosity requirement. *See, e.g., In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016); *Marcus*, 687 F.3d at 595;

Here, the number of class members is in the thousands. On September 4, 2018, Amazon filed the Declaration of Peter Nickerson in support of its opposition to the motion to remand. (*See* Ex. C). Nickerson's review of Amazon's payroll data for individuals employed as Fulfillment Center Associates in New Jersey from May 11, 2016 through August 27, 2018 revealed that such individuals worked a total of 131,823 bi-weekly pay periods during which the employee worked at least 40 hours in each workweek. (Ex. C, Nickerson Decl. ¶ 7). Nickerson's review further revealed that in 184,588 additional bi-weekly pay periods, an employee worked at least 40 hours in one of the two workweeks. (*Id.* ¶ 8). As the period examined by Nickerson covers only 119 weeks, more than 2,200 individuals would be required to work just the 131,823 bi-weekly periods referenced above (131,823 bi-weekly pay periods *

15

2 = 263,646 workweeks; 263,646 / 119 weeks = 2,215.5). Accordingly, the proposed class satisfies the numerosity prong.

c.   There are questions of law and fact common to the members of the class

To certify a class under Rule 23(a), there must exist questions of law and fact common to the members of class. To certify the proposed class under Rule 23(b)(3), Named Plaintiff must establish that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

"A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). But "[c]ommonality does not require perfect identity of questions of law or fact among all class members." *Id.* In assessing commonality, "a court's focus must be on whether the defendant's conduct is common as to all class members." *Id.* "[T]he bar is not a high one." *Id.*

Here, multiple common questions unite the class, including (1) whether Amazon required its FC Workers to engage in Security Screenings; (2) whether Amazon failed to compensate FC Workers for Security Screenings; and (3) whether time spent undergoing mandatory Security Screenings, including the time spent walking to the Security Screenings following clocking out, constitutes compensable

16

work time. The presence of these common questions alone is enough to satisfy Rule 23(a)(2).

Additionally, the Third Circuit has "held that Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is 'far more demanding than the latter.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)). "[T]he 'predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members.'" *Id.* (quoting *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011)). As set forth below, because Named Plaintiff can establish that common issues predominate over individual issues, for those reasons as well, Named Plaintiff has established the commonality under Rule 23(a)(2).

d. Named Plaintiff's claims are typical of the claims of the members of the class

Named Plaintiff's claims are typical of the claims of the class. A claim is typical under Rule 23(a)(3) if it "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (quoting *Hoxwork v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992)). The threshold for satisfying the typicality requirement is low. *Barr v. Harrah's*

*Entertainment, Inc.*, 242 F.R.D. 287, 292 (D.N.J. 2007). The court answers this question by asking **not** whether the *plaintiff* is typical but whether the plaintiff's *claims* are typical, in common-sense terms, of the class member's claims, thereby suggesting that the plaintiff's incentives align with rather than conflict with those of the class. *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). "In instances where it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 140 (D.N.J. 2002).

Named Plaintiff was an FC Worker subject to Amazon's Security Screening policies. She seeks to represent a class that includes all hourly fulfillment center employees who worked in New Jersey and were subject to the same policies. Named Plaintiff satisfies the typicality requirement because her claims—violations of the NJWHL for unpaid Security Screenings—are identical to the claims of the class. *See Beck*, 457 F.3d at 295-96. Named Plaintiff was harmed in the same way and her claims are based on the same legal theory as all other members of the class. *See Zinberg v. Washington Bancorp, Inc.*, 1385 F.R.D. 397, 407 (D.N.J. 1990). Accordingly, Named Plaintiff's proposed class also satisfies the typicality prong.

e. <u>Plaintiff will adequately represent the interest of the members of the class</u>

In the Third Circuit, courts look to two elements to assess the adequacy of class representation under Rule 23(a)(4): "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625 (internal citations omitted).

Named Plaintiff satisfies the first element of the adequacy test, because her counsel has substantial experience in litigating class action wage and hour cases. As discussed in the accompanying declaration of Justin L. Swidler, Swartz Swidler LLC has litigated more than 150 putative federal wage and hour class actions in the last 13 years and have been certified class or collective action counsel in numerous wage and hour class actions throughout the United States. Swidler Decl. ¶ 13. Courts in the Third Circuit and courts in other circuits previously have recognized Swartz Swidler as being particularly skilled in this area of the law. *See, e.g. McGee v. Anne's Choice, Inc.*, 2014 U.S. Dist. LEXIS 75840 (E.D. Pa. 2014) (finding Mr. Swidler to be "well-versed in FLSA cases and skilled in litigating and settling wage-and-hour litigation"); *Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889, *14 (E.D. Pa. 2014) (Restrepo, J.) (finding Swartz Swidler to "have considerable experience

handling class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation."); *Maddy v. General Electric Co.*, 2017 WL 2780741 at *7 (D.N.J. 2017) (finding Swartz Swidler has substantial experience litigating wage and hour cases); *Browne v. P.A.M. Transp., Inc.*, 2020 WL 4430991, at *2 (W.D. Ark. July 31, 2020) ("The litigation stretched over nearly four years and involved extensive motion practice, voluminous discovery, and numerous depositions. It presented novel questions of law. [Swartz Swidler] proved themselves to be highly skilled and experienced in this particular area of litigation."); *Salinas v. U.S. Xpress, Inc.*, 2018 WL 1477127, *6 (E.D. Tenn. 2018) ("Plaintiffs' counsel has substantial experience litigating complex wage and hour actions, including class actions and certified collective actions with tens of thousands of class members").

The test for the second element is whether the proposed representative has conflicts that make it likely that the class members' interests will be disregarded. *Tyco Labs, Inc. v. Kimball*, 444 F. Supp. 292, 299 (E.D. Pa. 1977). "The linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen AG*, 681 F.3d 170, 183 (3d Cir. 2012). Here, Named Plaintiff suffered the same type of injury

20

as the absent class members; accordingly, Named Plaintiff's interests are aligned with the class.

Accordingly, the Court should find that Named Plaintiff has satisfied the adequacy prerequisite.

### 2. The Putative Class Satisfies Each Pre-Requisite for Certification under Rule 23(B)(3)

Rule 23(b)(3) sets forth two additional requirements to class certification: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For the following reasons, the proposed class also satisfies these prerequisites.

#### a. <u>Common issues of law and fact predominate over individual issues with respect to the class</u>

To be certified under Rule 23(b)(3), common issues must predominate over individual issues. The predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation. *In re Ins. Brokerage Antitrust Litig*., 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem*, 521 U.S. at 623-24).

Predominance is satisfied where the plaintiff "demonstrate[s] that the elements of [its] claim[s] … are capable of proof at trial through evidence common

to the class, as opposed to individualized evidence." *In re Hydrogen Peroxide*, 552 F.3d at 311-12. The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023). To answer that question, courts must look to the elements of the claim to assess whether the class members can prove their claims with evidence common to the class rather than individual to its members. *Id.* at 156. Still, the need to prove damages individually does not disturb a finding of predominance. *Id.*; *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020).

Where the claim is that a single uniform company policy was unlawful and resulted in the identical type of damages for the class members, courts find that the predominance requirement is easily satisfied. *See Hargrove v. Sleepy's LLC*, No. 22-2040, 2023 U.S. App. LEXIS 14553, at *1 (3d Cir. June 12, 2023) (identical claims based on nearly identical facts satisfy predominance requirement and should be certified); *Univ. of P.R. Ret. Sys. v. Lannett Co.*, No. 21-3150, 2023 U.S. App. LEXIS 9143, at *11 (3d Cir. Apr. 18, 2023) (single theory of liability tied to single theory of damages satisfies predominance analysis); *Rivet v. Office Depot, Inc.*, 207 F. Supp. 3d 417, 432 (D.N.J. 2016) (finding predominance where claim was based on a uniform corporate overtime policy alleged to be illegal); *Moore v. Ulta Salon,*

22

*Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 611-12 (C.D. Cal. 2015) (citing cases). "Common corporate policies … carry great weight for certification purposes, and **predominance is rarely defeated in cases where such uniform policies exist**." *Hargrove*, 2023 U.S. App. LEXIS 14553 at *7 (emphasis added) (quoting *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 944 (9th Cir. 2019)).

Here, common issues of law and fact clearly predominate with respect to Named Plaintiff's NJWHL claim for unpaid overtime wages. The central question in this case is whether Amazon's uniform policy of requiring unpaid Security Screenings at the end of each shift violates the NJWHL. To prevail, Named Plaintiff must prove that (1) Amazon uniformly required FC Workers to undergo Security Screenings, and (2) Amazon failed to pay overtime wages for the time between clocking out and completing these mandatory screenings. *See* ECF Doc. 42, pp. 9-10, 12.

The record before the Court demonstrates that common evidence will suffice to prove these elements on a class-wide basis. It is undisputed that Amazon universally required all FC Workers at its New Jersey facilities to undergo Security Screenings at the end of their shifts between May 2016 and March/April 2020 and then resumed doing so at certain facilities at some point thereafter. (SOF ¶¶ 12-15). Regardless of the specific facility, all FC Workers had to walk from the time clocks to the screening area to complete this mandatory process. (SOF ¶¶ 12-22). Critically,

23

during the entirety of the Relevant Period, "[a]s to such periods when security screening has been active, **Amazon further admits** and avers that … employees at New Jersey fulfillment centers must pass through security screening apparatus upon leaving the secured area **after clocking out** at the end of their shift." (ECF Doc. 62, Answer to Second Amend. Compl., at ¶ 37 (emphasis added)). Finally, Amazon admits that it did not pay overtime wages during overtime workweeks for any time or activity that is not captured by its timeclock system (*i.e.,* the time FC Workers spend walking to and undergoing Security Screenings after they clock out) regardless of duration of the unpaid time. (SOF ¶¶ 10-11).

As a uniform policy applied to all FC Workers, common issues of fact and law predominate as to this claim, as the Court can determine the lawfulness of this practice in one stroke. *See Hargrove*, No. 22-2040, 2023 U.S. App. LEXIS 14553, at *1; *Moore*, at 611-12. "Common corporate policies" challenged as unlawful "**carry great weight for certification purposes, and predominance is rarely defeated in cases where such uniform policies exist.**" *Hargrove*, No. 22-2040, 2023 U.S. App. LEXIS 14553, at *7 (emphasis added).

Named Plaintiff expects Defendant will argue that because class members' damages will vary based on how long, on any particular day, they spent undergoing the Security Screening, individual issues preclude a predominance finding since each class members' damages will vary. The Third Circuit entertained a similar

argument in *Hargrove* and rejected same where the defendant argued predominance could not be satisfied because the putative class members "worked different hours" and the defendant "did not record those hours." *Id.* at \*7-8.

An "employees' wage claims should not suffer on account of an employer's failure to record hours as required by law," and, in such cases, "can prove their claims through common evidence showing the amount and extent of [their] work as a matter of just and reasonable inference." *Id.* at \*8. In *Hargrove*, the Third Circuit determined that there was significant such common evidence that could be used to permit that inference, including "gate logs … manifests and scanner data showing the duration of [routes and stops] … "and representative testimony from class members about their hours." *Id.* Recognizing that the defendant was arguing that the evidence in question might not be truly representative of the drivers' hours, the Third Circuit held that, even if the defendant was correct that the evidence was "unrepresentative or inaccurate," "that defense is itself common to the claims of all class members and so supports class certification." *Id. See also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375-75 (3d Cir. 2015) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well-nigh universal.)"

Here, like in *Hargrove*, common evidence can be used to prove class members' claims as a matter of just and reasonable inference. Amazon's records

capture the precise times FC Workers clocked out and the precise time each exited the FC. (*See* SOF at ¶¶ 40-46). Amazon also recorded how long class members spend undergoing secondary screenings. (SOF at ¶ 44-46). With such records, Named Plaintiff likely could reconstruct an accurate record of the time they spend in unpaid security screenings, but, as *Hargrove* pointed out, and, as has been the law of the land since 1946, the class' burden to prove damages is far less, and can be done merely as a matter of inference with the best evidence available. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 689, 686-88 (1946),

Even if Defendant had no electronic time records that could be used to determine the unpaid hours worked (they do), the class could still prove their damages by relying on representative testimony alone. *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 460 (2016). In *Anderson v. Mt. Clemens Pottery Co.*, eight employees testified on behalf of 300 employees, 2.7% of the total. 328 U.S. 680, 690-691 (1946). In *Tyson Foods*, 53 workers stood in for 3,344, 1.5% of the total. 136 S.Ct. at 1055 (Thomas, J., dissenting) (explaining the number of employees used in the time-study). In *Monroe v. FTS USA, LLC*, the Sixth Circuit found representative testimony from 17 collective action members testifying on behalf of a class of 293, or 5.7% of the total, sufficient to sustain a finding that an unofficial policy-to-underreport-overtime was applied to all. 860 F.3d 389, 406, 410-411 (6th Cir. 2017). In *Morgan v. Family Dollar Stores*, the Eleventh Circuit allowed

26

7 out of 1,424 plaintiffs to testify as to job duties in an overtime misclassification case, less than 1% of the total. 551 F.3d 1233, 1279 (11th Cir. 2008). Accordingly, any argument that predominance cannot be established because of variation in damages should be rejected.

Finally, numerous district courts have certified similar cases involving claims for unpaid time spent between clocking out and clearing security screens. *See, e.g., Alfonso v. FedEx Ground Package Sys.*, 2024 U.S. Dist. LEXIS 40928 (D. Conn. Mar. 8, 2024); *Davis v. Target Corp.*, 2023 U.S. Dist. LEXIS 214818 (E.D. Pa. Dec. 1, 2023); *Lao v. H&M Hennes & Mauritz, L.P.*, 2018 U.S. Dist. LEXIS 133969 (N.D. Cal. Aug. 8, 2018) (involving post-shift "bag checks" at 80 retail stores); *Kurihara v. Best Buy Co.*, 2007 U.S. Dist. LEXIS 64224, at *31 (N.D. Cal. Aug. 29, 2007) (involving post-shift uncompensated security checks).

In *Alfonso v. FedEx Ground Package Sys.*, the court certified a class action of FedEx warehouse employees at eight Connecticut facilities whom FedEx did not pay overtime wages for, *inter alia*, time spent between clocking out and clearing security screenings like the ones at issue here. 2024 U.S. Dist. LEXIS 40928, *5 (D. Conn. Mar. 8, 2024) ("The layout of security and the devices employed at security checkpoints vary somewhat … but all facilities have some form of security checkpoint." (internal quotation marks omitted). There, the court held that, while "variations in the equipment used for security screenings at the various facilities[]

27

[and] how what an employee brings with him or her may impact his or her time in security", *inter alia*, "could impact the time an employee spent engaged in the challenged activities, and therefore damages …, they are ultimately insufficient to outweigh the common questions." *Id.* at *43.

At its core, this case turns on the common and predominant question of whether time spent in mandatory Security Screenings is compensable under the NJWHL. This question predominates over any individual issues. If Amazon's uniform policy is found unlawful, liability is determined for all class members in one fell swoop.

Accordingly, the Court should find that Named Plaintiff has satisfied the predominance requirement under Rule 23(b)(3).

### b. The class action method is superior to alternative available methods of adjudication

The final prerequisite for class certification is that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23 (b)(3). The Rule identifies the following factors pertinent to such a finding: (1) the interest of individual class members in individually controlling the prosecution of separate actions; (2) the extent and nature of any previously commenced litigation concerning the controversy; (3) the desirability or undesirability of concentrating the litigation of the claims in a single forum; and (4) the difficulties likely to be encountered in the management of a class action. *Id*.

Here, all these factors weigh heavily in favor of class treatment. First, individual class members have little interest in controlling the prosecution of separate actions. The relatively small amount of unpaid overtime wages at stake for each FC Worker makes individual litigation economically infeasible, as the costs would certainly dwarf any potential recovery. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (finding superiority where each class had a "small claim in relation to the cost of prosecuting a lawsuit"); *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 902 (N.D. Cal. 2015).

Second, concentrating these claims in a single forum is desirable, for the same reasons set forth above, a single forum will avoid the risk of inconsistent judgments and inefficiencies attendant to a multiplicity of proceedings, and, because all events occurred in New Jersey, there is no disadvantage to a single, consolidated class proceeding.

Third, there are no foreseeable difficulties in managing this case as a class action. The central question of Amazon's liability is common to the class, and the identification of class members and calculation of damages can readily be accomplished through common evidence. *See supra* at 23-32.

Finally, Named Plaintiff is not aware of any class members that have commenced individual actions concerning this controversy. Even if such cases existed, it would still be desirable to concentrate the claims in a single forum to avoid

29

duplicative efforts and inconsistent results. The class action device is designed to "save [] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). That is precisely what Named Plaintiff seeks to accomplish here.

In sum, a class action is not merely superior to other available methods for the fair and efficient adjudication of this controversy—it is the only realistic method. The alternative to a class action is that Amazon retains the benefit of the wages it failed to pay its workers in violation of the NJWHL. The superiority requirement of Rule 23(b)(3) is thus readily satisfied.

## **CONCLUSION**

For the foregoing reasons, Named Plaintiff respectfully requests that this Honorable Court grant the instant motion.

Respectfully Submitted,

*/s/ Matthew D. Miller*
Matthew D. Miller, Esq.
Joshua S. Boyette, Esq.
Justin L. Swidler, Esq.

Date: March 22, 2024