**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIANE VACCARO and JENNIFER CHIU, individually and on behalf of all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMAZON.COM.DEDC, LLC, <br><br> Defendant. | Civil Action No. 18-11852 (GC) (TJB) <br><br> **OPINION** |

**CASTNER, District Judge**

THIS MATTER comes before the Court upon three motions: Defendant Amazon.com Services LLC's[1] Motion to Dismiss Plaintiff Diane Vaccaro's claims pursuant to Federal Rules of Civil Procedure (Rules) 37(d) and 41(b) for failure to cooperate in discovery (ECF No. 99); Plaintiff Jennifer Chiu's Motion for Class Certification pursuant to Rule 23 (ECF No. 101); and Amazon's Motion for Summary Judgment pursuant to Rule 56 (ECF No. 100). The parties briefed the Motions to Certify Class and for Summary Judgment. (ECF Nos. 100-102, 106-109.) Amazon's Motion to Dismiss is unopposed. The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Amazon's Motion to Dismiss Vaccaro's claims is **GRANTED**; Plaintiff's Motion for Class Certification is **DENIED**;

---

[1]    Amazon represents that "Amazon.com.dedc, LLC was merged into Amazon.com Services LLC and no longer exists." (ECF No. 100-1 at 6 n.1.) Plaintiffs do not dispute this statement, nor does it affect the Court's analysis.

and Amazon's Motion for Summary Judgment is **DENIED**.

## I.   <u>BACKGROUND</u>

### A.    **Procedural Background**

This matter arises out of Amazon's alleged failure to pay overtime wages to hourly employees for their time spent undergoing mandatory security screenings in Amazon's New Jersey facilities.  On June 4, 2018, Vaccaro—a warehouse worker at Amazon's fulfillment center in Robbinsville, New Jersey—filed a putative class action in the Superior Court of New Jersey, Mercer County, alleging two violations of the New Jersey Wage and Hour Law (NJWHL) for Amazon's failure to pay overtime wages for post-shift security screenings and for time spent on meal breaks.  (ECF No. 1-1.)  Amazon properly removed the case to this Court[2] and moved for judgment on the pleadings.  (ECF No. 30.)

On June 29, 2020, the Court denied judgment on the pleadings for Amazon with respect to the mandatory post-shift security screenings.  (ECF No. 42 at 6-13.[3])  The Court found that time spent undergoing security screenings at the end of the workday is compensable as "hours worked" under the NJWHL and its administrative regulations.  (*Id.* at 6.)  But the Court granted judgement on the pleadings for Amazon with respect to time spent on meal breaks during the workday, holding that "the act of undergoing a security check *during the course of the workday* is the consequence of an employee's choice to take his or her meal break outside of Amazon's premises and serves primarily to benefit the employee."  (*Id.* at 14.)  The Court thus held that "time spent

---

[2]    The Court has previously found that it has subject-matter jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).   (*See* ECF No. 21 at 9-10 (denying Plaintiff's Motion to Remand).)

[3]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

on meal breaks during the course of the workday is not required to be counted towards 'hours worked'" under the NJWHL and its regulations. (*Id.*)

On March 17, 2021, the Court granted Plaintiff's motion to file a Second Amended Complaint (SAC). (ECF No. 53.) The SAC adds as a named plaintiff Amazon employee Jennifer Chiu, and a claim that Amazon failed to pay Chiu and putative class members for pre-shift COVID-19 screenings. (ECF No. 58.) Amazon answered (ECF No. 62), and the parties proceeded to discovery.

In September 2021, Vaccaro stopped responding to her counsel's attempts to schedule a deposition, and Vaccaro has not communicated with counsel or otherwise appeared before the Court as of the date of this Opinion. (ECF No. 99-1 ¶¶ 5-12.) As a result, Amazon has been unable to depose Vaccaro and proceed against her claims. (*Id.* ¶ 11.) In November 2021, Amazon moved without opposition to dismiss Vaccaro's claims based on her lack of participation in discovery. (ECF No. 68.) Amazon also moved for summary judgment as to Chiu's claims, and Chiu moved for class certification. (ECF Nos. 67 & 69.)

In February 2022, Chiu moved to strike certain exhibits that Amazon submitted with its opposition to Chiu's motion for class certification. (ECF No. 78.) The Court terminated the pending motions and referred the parties to the Magistrate Judge to resolve the discovery issues raised by Chiu. (ECF No. 85.) The parties litigated Chiu's motion to strike and other discovery disputes, and this Court affirmed the Magistrate Judge's decision granting Chiu's Motion to Strike. (ECF No. 98.) The parties then filed the present motions. (ECF Nos. 99-101.)

Plaintiffs bring three claims in the SAC. Count I is a violation of the NJWHL on behalf of the named Plaintiffs and proposed class for Amazon's failure to pay overtime wages for time spent in post-shift security screenings. (ECF No. 58 ¶¶ 53-59.) Count II is a violation of the NJWHL

on behalf of the named Plaintiffs and proposed class for Amazon's failure to pay overtime wages for time spent on meal breaks.  (*Id.* at 9.)  Count III is a violation of the NJWHL on behalf of the named Plaintiff Chiu and the proposed class for Amazon's failure to pay overtime wages for time spent in COVID-19 screenings.  (*Id.* ¶¶ 60-63.)  The Court previously entered judgment on the pleadings in favor of Amazon with respect to Count II and dismissed Count II with prejudice.  (ECF Nos. 42 & 43.)  And Chiu has withdrawn her claims under the NJWHL arising from her employment with Amazon during 2020, which includes the entirety of Count III for Amazon's alleged failure to pay overtime wages for time spent in COVID-19 screenings.  (ECF No. 74 at 19; ECF No. 107-1 at 3 ("Plaintiff is withdrawing her claims under the NJWHL arising from her employment during 2020.").)  Thus, only Vaccaro and Chiu's claims under Count I remain before the Court.

### B.    Factual Background

#### 1.    *Chiu's Motion for Class Certification*

Chiu seeks to certify a class on behalf of the following putative class members:

> All Defendant's hourly fulfillment center employees who worked in New Jersey and who, during at least one workweek from May 11, 2016 (two (2) years prior to the original date of the filing of the Complaint) through the present, worked at least 40 hours during a workweek according to Defendant's timekeeping system.
>
> [(ECF No. 101-1 at 5.)

At any given time during the period of May 2016 through the present, Amazon operated between four and eight Fulfillment Centers (FCs).  (*Id.* at 7 ¶ 2.)  Amazon's security screening policies and procedures, however, differed before and after the start of the COVID-19 coronavirus pandemic in March 2020 in the following ways.

### a.     *May 2016 through March 31, 2020*

From May 2016 through March 31, 2020, all Amazon employees in New Jersey ended their shifts by "clocking out" of Amazon's timekeeping system exclusively through timeclocks located in the FCs.  (*Id.* at 8 ¶ 5.)  Each employee carried a unique ID badge that they would use to clock out at the timeclocks.  (*Id.* at 14-15 ¶¶ 41-42.)  During this time period, in all New Jersey facilities that were implementing security screenings, employees were required to undergo a post-shift security screening after clocking out, but before exiting the FC.  (*Id.* at 9-13 ¶¶ 12-34.)

Chiu avers that from May 2016 through March or April 2020, except during emergencies such as fire alarms, all New Jersey Amazon facilities uniformly required employees "to undergo a Security Screening after clocking out but before exiting the FC."  (ECF No. 101-1 at 9 ¶ 12.)  However, Chiu also testified at her deposition that when she worked at Amazon's Avenel facility from February 1 to March 23, 2019, the Avenel facility did not have any security screening in place.  (*See* ECF No. 106-2 at 10-11, 55:19-56:2 & 19-20, 97:16-98:3; ECF No. 106-3 at 2, 8-9.)

After clocking out in a facility with security screening, every employee was required to pass through a "primary screening" process, whereby employees passed through one of multiple lanes depending on whether they carried any bags or personal items.  (ECF No. 101-1 at 10-11 ¶¶ 15-22.)  If the employee carried no personal items or bags, the employee could walk through an "Express Lane," which consisted of a metal detector.  (*Id.* at 10 ¶ 19.)  If the employee carried personal belongings such as keys, spare change, or a bag, they would walk through a "Divesting Lane" by placing their belongings to the side and then passing through a metal detector under observation by a security officer.  (*Id.* at 10-11 ¶¶ 19-21.)  Employees could choose to store personal belongings in lockers when arriving at work so that upon exiting the warehouse floor at the end of the workday, they could "move through security faster."  (ECF No. 106-2 at 26, 106:2-

17.)  Amazon encouraged employees to store their personal belongings in their assigned lockers when arriving at work.  (*Id.*; ECF No. 101-4 at 29-30, 109:25-111:17.)

Regardless of whether an employee passed through an "Express Lane" or a "Divesting Lane," if the employee set off a metal detector, the employee was not permitted to leave and was required to undergo a "secondary screening."  (ECF No. 101-1 at 10-11 ¶¶ 20-26.)  The secondary screening consisted of a security officer using a handheld metal detector, also referred to as a "wand," to sweep the employee.  (*Id.* at 12 ¶ 27.)  If the wand continued to detect something on an employee after multiple sweeps and even after the employee removed any objects potentially setting off the wand, the employee was required to complete a "Failure to Clear Screening" form and was only then permitted to exit the facility.  (*Id.* at 12-13 ¶¶ 30-33.)  From 2016 to March or April of 2020, some secondary screening areas had badge readers installed, and employees would scan their ID badge if they were required to step into the secondary screening area so the additional amount of time spent there could be recorded.  (ECF No. 101-4 at 13, 45:1-23.)  But not all facilities had badge readers at the secondary screening areas during this time period.  (*Id.* at 14, 46:12-24.)  In late 2017 or early 2018, some facilities began using X-ray screening technology to screen bags that had been carried onto the warehouse floor upon arrival.  (*Id.* at 28, 104:15-22; ECF No. 106-2 at 31, 116:17-25.)

After clocking out and passing through security screening, but before exiting the building, employees could and sometimes did spend time talking with co-workers, using the restroom, retrieving belongings from the locker rooms, waiting for carpools, and watching television or using computers in the break room.  (ECF No. 106-2 at 27-29, 111:9-113:19.)  Badge readers located at the exits of each FC recorded the time at which each employee physically exited the building.  (ECF No. 101-1 at 15 ¶ 43.)  However, data showing when an employee exited the building was

unrelated to an employee's compensation. (*See id.*)

Chiu claims that other than the implementation of X-ray screening for bags, the above security screening procedures remained unchanged from May 2016 through March or April of 2020, when the COVID-19 coronavirus pandemic occurred. (ECF No. 101-1 at 13 ¶ 34.)

### b.    March 31, 2020 through the Present

In March or April of 2020, Amazon's timekeeping and security screening policies changed. Beginning on March 31, 2020, employees were given the option of clocking out using either the timeclocks located in the FCs, or their smartphones via an application called "Amazon A to Z" (the A-Z App). (ECF No. 101-1 at 8 ¶ 6.) Employees have had the option of clocking out using either of these two different methods since March 31, 2020. (*Id.*) Employees who use the A-Z App can wait to clock out until after they pass through the security screening, and therefore be compensated for any time spent undergoing screening. (ECF No. 101-5 at 23, 86:9-23.) Amazon had no explicit policy against employees using the A-Z App to clock out prior to undergoing security screening. (*Id.*)

Additionally, in March or April of 2020, "during the beginning of the COVID-19 Pandemic, Amazon temporarily suspended Security Screenings at all FCs." (ECF No. 101-1 at 9 ¶ 13.) Some FCs eventually resumed security screenings. (*Id.* ¶ 14; ECF No. 101-4 at 31, 117:4-25.) Where security screenings have resumed, Primary Screening no longer involves metal detection. (ECF No. 101-1 at 13 ¶ 35.) Instead, Amazon requires employees to pass through "detectors that Amazon programmed to randomly select individuals—slightly less than 3%—to undergo a Secondary Screening." (*Id.*) The new secondary screenings require employees to walk through a metal detector instead of undergoing sweeping with a handheld wand. (*Id.* ¶ 36.) An employee is required to complete a Failure to Screen Form upon triggering multiple alarms. (*Id.*

at 14 ¶ 37.)  From March or April 2020 through the present, all secondary screening areas have badge readers installed to record the time in which each individual employee's screening is complete.  (*Id.* at 15 ¶ 46.)

All FCs that resumed security screenings after the start of the COVID-19 Pandemic conduct them in the manner described above.  (*Id.* at 14 ¶ 39.)  But to date, not all New Jersey FCs have resumed security screenings.  (*Id.* at 9 ¶ 14; ECF No. 101-4 at 31, 117:4-25.)

### 2.  *Amazon's Motion for Summary Judgment*

Chiu worked for Amazon in three different facilities: the Robbinsville facility from August 25, 2016 to April 18, 2017; the Avenel facility from February 1, 2019 to March 23, 2019; and the Logan Township facility from April 8, 2020 to May 23, 2020.  (DSMF ¶¶ 1-3.[4])  Chiu was subject to security screenings at the Robbinsville facility, but not the Avenel and Logan Township facilities.  (*Id.* ¶¶ 6-8; ECF No. 107-4 at 19-20, 95:6-98:3.)

When passing through security at the Robbinsville facility, Chiu used the express lanes and was usually able to walk through without stopping.  (DSMF ¶¶ 8-10, 13-15.)  Chiu never used the Divesting Lanes in which security officers checked employees' bags because Chiu did not bring her personal belongings onto the warehouse floor.  (*Id.*)

Chiu claims to have gone through a secondary screening "once or twice."  (*Id.* ¶ 11.)  On one occasion, Chiu spent between five or ten minutes undergoing the secondary screening.  (PSMF at 4 ¶ 4.)  The metal detector alarm was triggered because Chiu did not realize that she was carrying coins in her pocket.  (DSMF ¶ 12.)

---

[4]    Amazon's Statement of Undisputed Material Facts (ECF No. 100-2) is referred to as "DSMF," and Chiu's Response to Amazon's Statement of Material Facts and Statement of Additional Undisputed Material Facts (ECF No. 107-1) is referred to as "PSMF."  Amazon's response to Chiu's Statement of Additional Undisputed Material Facts (ECF No. 108-1) is referred to as "DRSMF."

The parties dispute whether Chiu was ever subject to a secondary screening on a second occasion.  (PSMF at 4 ¶ 4; DRSMF ¶¶ 4-7.)  When asked "[i]f there was a second time, do you recall what you were carrying that set it off?" Chiu responded, "[t]he second time . . . I actually don't remember what I was even carrying because I didn't understand why I was stopped because I had nothing in my pockets, but . . . they told me to go to the side and that's what I did."  (ECF No. 100-4 at 27-28, 103:21-104:4.)  Chiu testified that on the second occasion, a security guard inspected her using a metal detector wand, and that they "didn't find anything, so they just let me go."  (*Id.* at 28, 104:5-11.)  She estimated that this secondary screening took "roughly seven to ten minutes."  (*Id.* at 104:15.)  Amazon disputes that her testimony is sufficient "to establish that she did in fact pass through secondary screening on a second occasion."  (DRSMF ¶ 4.)

## II.    <u>STANDARD OF REVIEW</u>

### A.    **Motion to Dismiss**

"A District Court has the authority to dismiss a suit sua sponte for failure to prosecute by virtue of its inherent powers and pursuant to Federal Rule of Civil Procedure 41(b)."  *Iseley v. Bitner*, 216 F. App'x 252, 254-55 (3d Cir. 2007) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).  While courts are often required "to consider certain specific factors established by the Court of Appeals for the Third Circuit" in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 868 (3d Cir. 1984), courts "need not pursue a *Poulis* analysis when a plaintiff willfully refuses to prosecute his action."  *Joobeen v. City of Philadelphia Police Dep't*, Civ. No. 09-1376, 2011 WL 710219, at *2 (E.D. Pa. Feb. 28, 2011) (citing *Spain v. Gallegos*, 26 F.3d 439, 455 (3d Cir. 1994)).

B.    **Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted).  The "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp v. Behrend*, 569 U.S. 27, 33 (2013)).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350.  A court must engage in a "rigorous analysis" to determine whether all of Rule 23's prerequisites have been satisfied.  *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  This rigorous analysis has "three key aspects":

> First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence.  Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits.  Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it.

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (internal citations and quotations omitted) (cleaned up).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 322 (3d Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

### C.    Summary Judgment

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure." *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

## III.    <u>DISCUSSION</u>

### A.    Motion to Dismiss

The Court finds good cause to dismiss Plaintiff Vaccaro's claims under Rules 37(d) and 41(b) for her failure to appear for her deposition.  Vaccaro has not participated in this matter since approximately September 2021, after she ceased responding to her counsel when they attempted to contact her to schedule a properly-noticed deposition.  (ECF No. 99-1 ¶¶ 5-12.)  Amazon has been prejudiced because it has been unable to proceed against her claims.  (*Id.* ¶ 11.)  Nor has Vaccaro opposed Amazon's Motion.  Because Vaccaro has refused to proceed with her case, dismissal is appropriate even without balancing the *Poulis* factors.  *See Gallegos*, 26 F.3d at 455 (affirming the district court's *sua sponte* dismissal of the plaintiff's claims and noting that "in contrast to situations in which a court must balance [the *Poulis*] factors because the plaintiff does not desire to abandon her case," a court may dismiss without balancing the factors if the plaintiff

willfully refuses to prosecute her claims); *Abulkhair v. New Century Fin. Servs., Inc.*, 467 F. App'x 151, 153 (3d Cir. 2012) ("Where . . . a plaintiff refuses to proceed with his case or otherwise makes adjudication of [the] case impossible, a balancing of the *Poulis* factors is not necessary."). Therefore, Amazon's Motion to Dismiss is granted, and Vaccaro's claims are dismissed without prejudice to her potential inclusion as a class member in the event a class is ultimately certified. *See id.* at 152.  (ECF No. 99-1 ¶ 12.)

### B.    Motion for Class Certification

Under Rule 23(a)(1)-(4), a class may be certified only if:

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law or fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

These requirements are respectively referred to as the numerosity, commonality, typicality, and adequacy requirements.  *See id.*

"[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  Here, Chiu seeks certification under Rule 23(b)(3).  (ECF No. 101-1 at 25.) Where a party seeks to certify a class under Rule 23(b)(3), the moving party must satisfy three additional requirements.  *See Byrd*, 784 F.3d at 163.  First, the party "must prove by a preponderance of the evidence that the class is ascertainable." *Id.*  Second, Rule 23(b)(3) requires the party seeking certification to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Third, the party must show

"that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* These additional requirements are, respectively, referred to as the ascertainability, predominance, and superiority requirements. *See, e.g.*, *Byrd*, 784 F.3d at 161 n.4, 162-64; *Johnson v. Comodo Grp., Inc.*, Civ. No. 16-04469, 2024 WL 2933195, at *3 (D.N.J. Jun. 10, 2024). A district court "must first determine whether the putative class satisfies the . . . provisions of Rule 23(a), and then proceed[] to analyze the . . . provisions of Rule 23(b)(3)." *In re Citizens Bank, N.A.*, 15 F.4th 607, 612 (3d Cir. 2021).

Chiu argues that pursuant to Rule 23(b)(3), common questions of law and fact predominate over individualized questions in this matter, and that a class action is superior to other available methods of adjudicating the claims. (ECF No. 101-1 at 25.) Chiu proposes the following class:

> All Defendant's hourly fulfillment center employees who worked in New Jersey and who, during at least one workweek from May 11, 2016 (two (2) years prior to the original date of the filing of the Complaint) through the present, worked at least 40 hours during a workweek according to Defendant's timekeeping system.
>
> [(*Id.* at 5.)]

The Court addresses each of Rule 23's requirements in turn. *Citizens Bank*, 15 F.4th at 612.

### 1.    *Rule 23(a)*

#### a.    *Numerosity and Adequacy of Representation*

The numerosity and representation requirement of Rule 23(a) are generally not in dispute by the parties. Numerosity is met where "the class is so numerous that joinder of all members is impracticable." *See* Rule 23(a)(1). Although there is no minimum number of members needed to satisfy numerosity, courts hold as a general rule that if the proposed members exceed forty people, the first prong of Rule 23(a) has been met. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir.

2001).  Here, Chiu has submitted the declaration of Peter Nickerson, an economist who attests that he examined Amazon's payroll data from May 11, 2016 through August 27, 2018 and determined that hourly employees worked a total of 131,823 bi-weekly pay periods during which the employees worked at least 40 hours in each workweek.  (*See* ECF No. 101-6 ¶¶ 1-9.)  Because that period of time covers only 119 weeks, it would take more than 2,200 individual employees to reach the 131,823 number.  (*Id.*; ECF No. 101-1 at 19.)  Amazon does not dispute this evidence or contest the numerosity requirement.  (*See* ECF No. 106.)  Accordingly, numerosity has been met.

The Court turns next to the adequacy of representation, which "depends on two factors"—the first of which is that the "plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation."  *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975) (citation omitted).  Here, there is no dispute that Chiu has demonstrated that her class counsel is adequate in this respect.  (*See* ECF No. 101-2.)  The second factor is that Chiu "must not have interests antagonistic to those of the class."  *Wetzel*, 508 F.2d at 247.  Here, although Amazon argues that Chiu is not sufficiently typical of the putative class members, Amazon does not argue that their interests diverge.  "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *Dewey v. Volkswagen AG*, 681 F.3d 170, 183 (3d Cir. 2012).  The record demonstrates that Chiu alleges the same type of injury as the putative class members—specifically, that they were uncompensated for overtime spent in mandatory post-shift security screenings.  Because no conflict between Chiu and the putative class members is apparent in the record, the adequacy requirement is satisfied.

### b.    *Typicality*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Rule 23(a)(3).  Although typicality and commonality are

similar, typicality is intended to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus*, 687 F.3d at 597 (citation omitted). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.* (citation omitted).

Amazon argues that Chiu is not sufficiently typical of the proposed class because her individual claims are "limited to a period of fewer than eight months (August 2016 to April 2017) that she worked at just one site," but she seeks to represent a class of employees working at all New Jersey facilities over a period of multiple years. (ECF No. 106 at 43.) Amazon's argument focuses on the periods of time in the proposed class definition when security screenings were either suspended or randomized, the latter of which was never applied to Chiu. (*Id.*) But as Chiu points out, her theory of relief—that she was not paid for compensable time undergoing security screenings—mirrors the theory of relief of the other putative class members. (ECF No. 101-1 at 21-22.) The factual differences between the security screening procedures used between facilities will "generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58; *see also Bedoya v. Am. Eagle Express, Inc.*, Civ. No. 14-2811, 2022 WL 3443983, at *6 (D.N.J. Aug. 17, 2022) (finding that typicality was met where the plaintiffs' theory of relief was that employees were misclassified as independent contractors and undercompensated, despite underlying factual differences such as "whether all couriers worked over 40 hours per week" or "received the same deductions and withholdings"). Nor has Amazon

demonstrated that Chiu would be "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Marcus*, 687 F.3d at 597 (citation omitted). Accordingly, Chiu has satisfied the typicality requirement.

### c.    Commonality

Commonality requires "questions of law or fact common to the class." *See* Rule 23(a)(2). The commonality requirement centers on "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (citation omitted). Where, as here, a party seeks class certification under 23(b)(3), the "commonality and predominance requirements are closely linked," and "the Rule 23(b)(3) predominance requirement is 'far more demanding than the commonality requirement' found in Rule 23(a)." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). "In fact, 'where an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement.'" *Id.* (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008)). Accordingly, the Court will address the commonality factor together with predominance. *See Bedoya*, 2022 WL 3443983, at *5.

### 2.    Rule 23(b)(3)

### a.    Plaintiff's Proposed Class Does Not Meet the Commonality or Predominance Requirements

Amazon's primary argument is that Chiu's proposed class "meets neither the commonality requirement of Rule 23(a) nor the predominance requirement of Rule 23(b)(3)." (*See* ECF No. 106 at 20.) The Court agrees. For the reasons stated below, the Court finds that Chiu has not established that common questions of law or fact predominate over individualized questions for

this proposed class.

The predominance requirement "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 Newberg and Rubenstein on Class Actions § 4:49 (5th ed. 2012)). The predominance inquiry requires courts "to give careful scrutiny to the relation between common and individual questions in a case." *Id.* "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member." *Id.* (internal quotations and citation omitted). Courts look "to the elements of the plaintiffs' underlying claims . . . to assess whether the class members can prove their claims with 'evidence that is common to the class rather than individual to its members.'" *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023) (quoting *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127-28 (3d Cir. 2018)). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

Here, Chiu proposes three questions common to the class: "(1) whether Amazon required its FC Workers to engage in Security Screenings; (2) whether Amazon failed to compensate FC Workers for Security Screenings; and (3) whether time spent undergoing mandatory Security Screenings, including the time spent walking to the Security Screenings following clocking out, constitutes compensable work time." (ECF No. 101-1 at 20-21.)

To determine whether these questions have a capacity to generate common answers, the Court must first look to the "essential elements" of a claim under the NJWHL. *Hargrove v.*

*Sleepy's LLC*, Civ No. 22-2040, 2023 WL 3943738, at *3 (3d Cir. Jun. 12, 2023) (citing *Hydrogen Peroxide*, 552 F.3d at 311).  Here, Count I of the Amended Complaint alleges that Amazon failed to compensate Chiu for the time spent "in security screenings as hours worked for the purpose of paying overtime wages," as required under the NJWHL.  (ECF No. 58 ¶ 57.)  To prevail on an overtime claim, plaintiffs "must prove they worked more than '40 hours in any week' without receiving overtime pay."  *Hargrove,* 2023 WL 3943738, at *3 (quoting *Branch v. Cream-O-Land Dairy*, 243 A.3d 633, 637 (N.J. 2021)).

Thus, the question before the Court is whether the putative members of the proposed class could use common evidence to prove that they "worked more than 40 hours in any week without receiving overtime pay" due to uncompensated post-shift security screenings.  *See id.*  The Court finds that Chiu has not met her burden of showing that common questions of law or fact predominate over the proposed class, because the class as currently proposed "will need to present evidence that varies from member to member."  *See Tyson*, 577 U.S. at 453 (quoting 2 Newberg and Rubenstein on Class Actions § 4:50 (5th ed. 2012)).

Specifically, Chiu's proposed class fails under the predominance analysis because throughout the proposed class period, not all putative class members were subject to a uniform policy that required them to undergo mandatory post-shift security screenings without receiving overtime pay.  Not all New Jersey facilities consistently implemented security screenings during the class period; and the A-Z App introduced in 2020 has made it possible for employees to clock out after security screenings and therefore be compensated accordingly.  On the current record, Chiu has not established that common questions of law or fact predominate over these individualized issues pertaining to liability.

Chiu argues that common issues predominate because Amazon "uniformly required FC

Workers to undergo Security Screenings" and "failed to pay overtime wages for the time between clocking out and completing these mandatory screenings," so the "Court can determine the lawfulness of this practice in one stroke." (ECF No. 101-1 at 27-28.) Indeed, "[c]ommon corporate policies . . . carry great weight for certification purposes, and predominance is rarely defeated in cases where such uniform policies exist." *Hargrove*, 2023 WL 3943738, at *3 (citation and internal quotations omitted). But where claims for overtime compensation are not predicated on an "overarching policy," plaintiffs are less likely to establish commonality and predominance. *See, e.g.*, *Ferreras*, 946 F.3d at 185. For example, in *Ferreras*, American Airlines used a timekeeping system that paid employees only for the duration of their ordinary shifts even if the employees worked overtime. *Id.* at 181. American's policy required workers "to identify for a supervisor the time they worked outside of their shift and ask for approval of that time as an 'exception' to their ordinary work hours." *Id.* The plaintiffs alleged that "management regularly refuse[d] to pay employees for pre- and post-shift work and work done during meal breaks." *Id.* The Third Circuit found that the plaintiffs could not show commonality because the plaintiffs alleged, at bottom, that American often refused to compensate employees for overtime on a case-by-case basis—not that American implemented any "overarching policy" that deprived employees of overtime compensation. *Id.* at 185.

Similarly, Chiu is unable to show that throughout the proposed class period, Amazon implemented an overarching policy that deprived the putative class members of compensation for post-shift security screening. First, many employees in Chiu's proposed class period were not subject to any security screenings. In March or April of 2020, "Amazon temporarily suspended Security Screenings at all FCs," (ECF No. 101-1 at 9 ¶ 13), and although some facilities eventually resumed security screenings, there was "no one date when all the New Jersey fulfillment centers

resumed security screenings," and there are an unknown number of New Jersey facilities that have never resumed any form of security screenings, (ECF No. 101-4 at 31-33, 117:4-122:25).  Chiu argues that "[u]ndisputed periods of suspended screenings can be established through common proof," but Chiu has not submitted sufficient evidence to satisfy the Court that common questions of law and fact predominate over a period of nearly eight years across multiple facilities on this issue.  (ECF No. 109 at 14.)  In addition, the record shows that from March or April of 2020 to the present, employees who use the A-Z App can wait to clock out until *after* they pass through security screening, and thus receive compensation for any time spent undergoing screening.  (ECF No. 101-5 at 23, 86:9-23.)  Amazon has no explicit policy against employees using the A-Z App to clock out after undergoing security screening.[5]  (*Id.*)  Accordingly, not all putative members of the proposed class period were subject to a uniform unlawful policy that deprived them of compensation for post-shift security screening, because the record reflects that employees may be compensated for the screenings by clocking out *after* the screening using the A-Z App, or may not be subject to any screening at all.

By contrast, in the numerous cases cited by Chiu in which district courts certified classes "for unpaid time spent between clocking out and clearing security screens," it was undisputed that

---

[5]     Chiu argues that "even after Amazon permitted FC Workers to use the A-Z App to clock out instead of using the physical time clocks, Amazon still required FC workers to 'pass through security after clocking out at the end of their shift.'"  (ECF No. 101-1 at 8 ¶ 7.)  But Chiu's only support for this statement is Amazon's Answer to the SAC, in which Amazon generally states that during "periods when security screening has been active, . . . employees at New Jersey fulfillment centers must pass through security screening apparatus upon leaving the secured area after clocking out at the end of their shift."  (ECF No. 62 ¶ 37.)  But this portion of Amazon's Answer does not reference the A-Z App.  By contrast, one of Amazon's Rule 30(b)(6) designees testified that Amazon expects its employees to clock out using the A-Z App "whenever they are done working," and that there is not "anything saying that someone would have to clock out prior to going through security screening . . . [T]hey could stay clocked in as they go through security screening. . . . And clock out using the A to Z app on the other side."  (ECF No. 101-5 at 22-23, 85:15-87:1.)

throughout the proposed class periods, all putative class members were subject to some form of security screenings for which they were denied compensation.  (ECF No. 101-1 at 31.)  *See, e.g.*, *Alfonso v. FedEx Ground Package Sys.*, 2024 WL 1007220, at *2-3 (D. Conn. Mar. 8, 2024) (certifying a class of hourly employees who were unpaid for security screenings where all eight facilities during the proposed class period had "some form of security checkpoint," even though the "layout of security and the devices employed at security checkpoints var[ied] somewhat"); *Lao v. H&M Hennes & Mauritz, L.P.*, 2018 WL 3753708, at *2-5 (N.D. Cal. Aug. 8, 2018) (certifying a class where the employer required "all California retail store employees to undergo a security check before leaving the store" without compensation, and noting that where "there is no evidence that the entire class was subject to the same practice or policy, there is no question common to the class"); *Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698, at *10 (N.D. Cal. Aug. 30, 2007) (certifying a class where the plaintiff "provided substantial evidence of the existence of a company-wide policy whereby employees are subject to inspections, and not compensated for the time spent on those inspections").

In those cases, the courts could determine liability "in one fell swoop" through common evidence that all employees were subject to a uniform policy that required uncompensated post-shift security screenings.  (ECF No. 101-1 at 32.)  Because *liability* could be determined through common evidence of the unlawful policy, variations in wait time—even if "sometimes there could be no wait at all"—did not undermine predominance because such variations "primarily relate to damages."  *See Lao*, 2018 WL 3753708, at *7-11 (finding commonality and predominance where all employees at the end of their shift were subject to either a bag search or a brief "visual inspection" to confirm that they carried no bags, and finding that variations in wait time was a question of damages that did not defeat predominance).

Here, by contrast, Chiu's "proposed class inherently involves issues of individualized liability because [Amazon] *cannot* be liable to employees that were never subject to the alleged unlawful policy." *See Ogiamien v. Nordstrom, Inc.*, 2015 WL 773939, at *5 (C.D. Cal. Feb. 24, 2015) (declining to certify a class for uncompensated post-shift security screenings and finding that individualized questions predominated where some—but not all—employees were regularly subject to any security screenings).

Chiu argues that "the mere possibility that some employees occasionally may have clocked out after clearing security" using the A-Z App "does not defeat predominance" because damages could still be addressed through common evidence. (ECF No. 109 at 15.)  First, Chiu argues that Amazon's records can easily identify each instance in which an employee clocked out using the A-Z App. (*Id.* at 16.)  Second, there would be "no need for individualized inquiries" because "damages for these employees can be efficiently determined on a class-wide basis" through common evidence—specifically, by comparing Amazon's records showing when the employee clocked out and when the employee swiped out of the building with their ID badge. (*Id.*)

> For example, if an employee clocked out using the App after swiping out of the facility, they would have no damages.  If the App clock-out time occurred at the same time as the swipe-out time, or preceded it by a few seconds, the jury might reasonably infer that, on those occasions, the employee used the App to clock-out after clearing screening.  Finally, if the App clock-out preceded the swipe-out by minutes instead of seconds, the jury could reasonably infer that the employee had followed Amazon's required policies and clocked-out before undergoing the screening and that the additional screening time was compensable.

> [(*Id.*)]

The Court disagrees.  Whether an individual employee was subjected to security screenings—and if so, whether the employee was compensated for the screening by waiting to

clock out until after the screening—is not merely a question of damages, but one of liability. The A-Z App permits employees to clock out *after* proceeding through the post-shift security screenings. This proposed common evidence would not allow the Court to determine liability "for all class members in one fell swoop," as Chiu phrases it, because any employee who used the A-Z App to clock out after proceeding through the post-shift security screening would not be entitled to additional compensation. (ECF No. 101-1 at 32.)  Chiu has offered no common evidence to reasonably distinguish between employees who are entitled to compensation for their security screenings versus employees who are not entitled to compensation. Therefore, the question of liability during the proposed class period would be individualized depending on which facility each class member worked in; when the member worked at the facility; whether Amazon required the member to undergo any post-shift security screening at the time he or she worked at the facility; and if so, whether the member was actually compensated for the security screening by clocking out after the screening using the A-Z App.  All of these individualized issues relate to liability. *See Kurihara*, 2007 WL 2501698, at *9 (noting that "courts are comfortable with individualized inquires as to damages, but are decidedly less willing to certify classes where individualized inquiries are necessary to determine liability").

Other courts have considered similar security policies implemented by Amazon and have found that where the proposed class included "periods of time in which the screening process was not mandatory, did not occur, or was not applied to all putative class members," the issue of liability was too individualized for class certification. *See Trevino v. Golden State FC LLC*, 2023 WL 3687377, at *15 (E.D. Cal. May 26, 2023).  For example, in *Trevino*, the plaintiff sought to certify a class of Amazon employees who were not compensated for mandatory post-shift security screenings using metal detector lanes and bag checks. *Id.* at *10.   The magistrate judge

recommended not certifying the class in the "absence of a uniform policy consistently applied throughout the class period across the variety of Amazon's facilities," which "preclude[d] resolution of Plaintiffs' claims [based on exit screening procedures] on a class-wide basis." *Id.* at *13. During the proposed class period, "the majority of the Sorting Facilities that operated with metal detectors have since turned off those detectors," and "facilities did not require mandatory screening of employees during certain periods, such as to account for peak seasons when the lanes were subject to 'flushing' to prevent long lines to pass through security." *Id.* at *14-15. And in *Shaw v. Daifuku Services America Corp.*, the magistrate judge recommending denial of class certification found that even if the security contractor defendant could be liable for Amazon's unpaid post-shift security screenings, "not all Amazon facilities had security checks," so "the Court invariably would be called upon to engage in an individualized determination of whether a proposed Class member even underwent a security check." 2024 WL 1526733, at *19 (E.D. Cal. Apr. 9, 2024) (citing *Trevino*, 2023 WL 3687377, at *13).

Here, too, Chiu has not shown that all of the putative class members were subject to "a uniform policy consistently applied throughout the class period across the variety of Amazon's facilities." *Trevino*, 2023 WL 3687377, at *15. Many employees in the proposed class period were either subject to no security screenings, or were not subject to mandatory unpaid security screenings because they could clock out after security screenings using the A-Z App. "Without a specific, unlawful policy to establish consistent liability," the Court finds that individual questions of liability predominate over the proposed class, and the proposed class is not "sufficiently cohesive to warrant adjudication by representation." *Ogiamien*, 2015 WL 773939, at *6 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Therefore, like in *Ferreras*, the essential elements of the putative members' claims—that they worked more than 40 hours in a

24

week without receiving overtime pay for security screenings—requires individual treatment.  946 F.3d at 185.  *Cf. Tyson*, 577 U.S. at 454-60 (affirming class certification where all employees were uncompensated for the time they spent putting on and taking off safety gear even though there were individualized questions of how much time each employee took to perform those tasks).

### b.    Limiting the Proposed Class Period from 2016 to March or April 2020 does not Remedy the Commonality and Predominance Issues

Chiu argues that it "is undisputed that Amazon universally required all FC Workers at its New Jersey facilities to undergo Security Screenings at the end of their shifts between May 2016 and March/April 2020," even if the security policies differed between facilities thereafter.  (ECF No. 101-1 at 27.)  But even if the Court were to exercise its inherent authority to redefine the proposed class by limiting the class period from 2016 to March or April of 2020, Chiu has not established that common issues of liability predominate even during that period.[6]

In support of her Motion, Chiu submits excerpts of the testimony of one of Amazon's Rule 30(b)(6) designees, a Senior Regional Loss Prevention Manager for Amazon in Northeast Maryland who is familiar with New Jersey's security screening procedures during Chiu's proposed

---

[6]    In ruling on Plaintiff's Motion for Class Certification, the Court "is not bound by Plaintiffs' proposed class definition and has broad discretion to redefine the class, whether upon motion or *sua sponte*."  *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 03-MDL-1556, 2007 WL 4150666, at *9 (M.D. Pa. Nov. 19, 2007) (citations omitted); *see also Schultz v. Midland Credit Mgmt., Inc.*, Civ. No. 16-4415, 2020 WL 3026531, at *8-9 (D.N.J. Jun. 5, 2020) (redefining the plaintiff's proposed class *sua sponte* in a manner that satisfied Rule 23(b)(3)'s predominance requirement).  Indeed, the Third Circuit has "held that a court should alter the class definition in lieu of rejecting class certification, if possible."  *See* 3 Newberg and Rubenstein on Class Actions § 7:27 (6th ed. Supp. June 2024) (citing *Finberg v. Sullivan*, 634 F.2d 50, 64 n.9 (3d Cir. 1980) ("The problem identified by the district court might well be remedied by requiring a more specific or a narrower definition of classes. The district court should not deny certification on account of such problems without considering the possibility of redefining the classes.")); *see also In re Data Access Sys. Secs. Litig.*, 103 F.R.D. 130, 134-35 (D.N.J. 1984) (certifying the plaintiff's proposed class and subclass, "but with the class and subclass periods' termination dates different from those requested by the plaintiffs").

class period.  (ECF No. 101-3 ¶ 2; ECF No. 101-4 at 4, 9:19-25.)  The record, however, shows that from March 2016 through late 2017, there were some circumstances in which security screenings were suspended for reasons other than emergencies.  Specifically, when a large number of employees simultaneously approached primary screening lanes and created a risk "that screening could take more than 60 seconds for any individual, then all screening would be suspended until those conditions no longer exist[ed]."  (ECF No. 101-4 at 25, 91:21-92:1.)  This process of suspending security screenings out of "concern . . . that associates will be unduly delayed by a screening process" was known as a "screening andon."  (*Id.* at 90:5-91:4.)  Amazon would then resume screening when "the conditions that cause that concern are abated."  (*See id.*)

For example, Amazon required security officers to suspend security screenings when a 20-foot line of employees existed for over 60 seconds—but if the wait lasted fewer than 60 seconds, the decision to suspend screening was left to the security officer's "judgment call."  (*Id.* at 25-27, 92:22-98:18.)  When security screenings were suspended, the metal detectors would be disregarded as employees passed through.  (*Id.*)  Although use of screening andons were "extremely rare," the record shows that they occurred approximately two to three times in a seven-month window from mid-2016 to early 2017 in one New Jersey facility.  (*Id.* at 27, 98:20-101:9.)  Another court has found that similar occasional suspensions of Amazon's security policy created individual issues of liability sufficient to defeat predominance:

> Amazon has demonstrated that facilities did not require mandatory screening of employees during certain periods, such as to account for peak seasons when the lanes were subject to "flushing" to prevent long lines to pass through security. . . . [S]ecurity officers would "flush" the lanes and push associates through the detectors without requiring them to undergo screening.  If associates set off the metal detectors when security was pushing people through, those associates did not have to go through secondary screening.

> [*Trevino*, 2023 WL 3687377, at *14-15.]

26

*See also Shaw*, 2024 WL 1526733, at *19 (declining to certify a class where "not all members of Plaintiff's proposed subclass underwent a security check").

Additionally, Chiu asserts that from 2016 through at least March 2020, "Amazon subjected . . . every single class member to the security screening policy"—but the record Chiu cites in support of this statement refers to a period limited to 2016 and 2017.[7] (*See* ECF No. 109 at 8-9 (citing ECF No. 101-4 at 57:25-62:05, 80:25-81:12, 88:10-89:9).)

One portion of the record does suggest that Amazon uniformly implemented security screenings from 2016 through 2020. Specifically, after describing the process of clocking out at a physical timeclock and then proceeding through security screening, Amazon's Senior Regional Loss Prevention Manager testified that these "processes of security screenings . . . all apply going forward up until March or April 2020." (*Id.* at 29, 107:25-109:4.) But this evidence is contradicted by Chiu's own testimony that when she worked at the Avenel, New Jersey facility from February to March 2019, there were no security screenings "at all." (ECF No. 106-2 at 19-20, 97:22-98:3; ECF No. 106-3 at 2, 8-9.)

Accordingly, the record does not support Chiu's statement that "Amazon universally required all FC Workers at its New Jersey facilities to undergo Security Screenings at the end of their shifts between May 2016 and March/April 2020." (ECF No. 101-1 at 27.) For this reason, the Court will not exercise its inherent authority to limit the time period of the putative class. *See also Ferreras*, 946 F.3d at 185-86 (finding a lack of predominance where the plaintiffs' overtime claims were not due to an "overarching policy"); *Ogiamien*, 2015 WL 773939, at *4 (finding

---

[7]    Although limiting the class to this period or separating the class into sub-classes could possibly remedy some of the commonality and predominance issues identified herein, the parties have not proposed any redefined classes or subclasses, and the Court does not have sufficient information to find *sua sponte* that narrower class periods would satisfy the other requirements of Rule 23.

individualized liability issues and declining to certify a class for uncompensated post-shift security screenings where not all employees were consistently subject to the security screenings throughout the proposed class period); *cf. Alfonso*, 2024 WL 1007220, at *2-3 (certifying a class of hourly employees who were unpaid for security screenings where all eight facilities during the proposed class period had "some form of security checkpoint," even though the "layout of security and the devices employed at security checkpoints var[ied] somewhat"); *Lao*, 2018 WL 3753708, at *2-5 (noting that where "there is no evidence that the entire class was subject to the same practice or policy, there is no question common to the class" (citation omitted)).[8]

### C.    Summary Judgment

#### 1.    *Whether Time Spent in Security Screenings is "Controlled or Required" by Amazon for its Benefit*

Amazon moves for summary judgment on Chiu's NJWHL claim under Count I of the SAC. (ECF No. 100-1 at 6.)  The NJWHL "establish[es] a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to their health, efficiency and well-being."  N.J. Stat. Ann. § 34:11-56a.  The NJWHL requires New Jersey employers to pay employees the mandatory minimum wage, *id.* § 34:11-56a4; and pay their employees "for all hours worked," N.J.A.C. 12:56-5.1.[9]  "All the time the employee is required to be at his or her place of work or on duty shall be counted as hours worked."  N.J.A.C.

---

[8]    Because the Court has found that Chiu has not met the commonality and predominance requirements, the Court need not reach the ascertainability or superiority factors.  *See Ogiamien*, 2015 WL 773939, at *6.

[9]    The NJWHL further requires employers to pay "each employee not less than 1 ½ times such employee's regular hourly rate for each hour of working time in excess of 40 hours in any week."  § 34:11-56a4.

12:56-5.2(a).  As this Court has previously held, a "place of work" under N.J.A.C. 12:56-5.2(a) is "any place where the following two prongs are met: (1) an activity is performed that is controlled or required by the employer; and (2) such activity serves to primarily benefit the employer."  (ECF No. 42 at 6-8 (citing *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).)  And because the NJWHL does not incorporate the Portal-to-Portal Act, "time spent in mandatory security screenings at the end of the workday is compensable under the NJWHL" and cannot be excluded as a "postliminary" activity.  (ECF No. 42 at 12-13.)

Accordingly, the Court must determine whether, viewing the evidence in the light most favorable to Chiu, it is undisputed that Amazon's security screenings were not "controlled or required by" Amazon and were not primarily for Amazon's benefit.  (ECF No. 42 at 6-8 (citing *Tennessee Coal*, 321 U.S. at 598).)  *See also Auto-Owners Ins. Co.*, 835 F.3d at 402 (citing Fed. R. Civ. P. 56(a)).  Amazon argues that it has presented undisputed evidence that Amazon does not "require" any employees "to undergo any sort of delay while passing through post-shift security screening."  (ECF No. 100-1 at 7.)  Amazon recommended that Chiu and all employees stow their personal belongings in the facility's on-site lockers before they entered areas separated by security screenings, such as the warehouse floor.  (*Id.*)  Employees who did not bring any personal belongings were permitted to pass through metal detectors in the so-called "'express lanes' . . . without breaking stride."  (*Id.*)  Thus, if an employee ever spent any uncompensated time in security screening beyond the time it would take to pass through the metal detectors without breaking stride, such uncompensated time "was not required by Amazon but instead was the result of [the employees'] choice" to bring personal belongings into the secure workplace.  (*Id.* at 18.)  Therefore, Amazon argues that under the second prong, "any additional time voluntarily spent in such screening was not primarily for Amazon's benefit but rather due to the employee's personal

decisions" to carry personal items.  (*Id.* at 19.)

In response, Chiu argues that when Amazon's security screenings were in effect, employees had no choice but to pass through metal detectors and submit to secondary screening if the detectors were triggered, and that this process "was both required and controlled by Amazon, and therefore constitutes work—regardless of the length of time this work took."  (ECF No. 107 at 11.)  Chiu argues that this process served to benefit only Amazon "for the express purpose of determining whether she had stolen from her employer."  (*Id.* at 10-11.)

At summary judgment, the facts must be viewed "in the light most favorable to the non-moving party and drawing all inferences in favor of that party."  *Auto-Owners Ins. Co.*, 835 F.3d at 402 (citing Fed. R. Civ. P. 56(a)).  Here, there are genuine disputes of material fact that preclude summary judgment because when viewing the evidence in a light most favorable to Chiu, a reasonable jury could find that when Chiu worked at the Robbinsville facility from August 2016 to April 2017, she was required by Amazon to undergo security screenings regardless of whether she chose to bring personal items with her.  (*See* DSMF ¶¶ 1-3, 6-8.)

First, a reasonable jury could find that Amazon's security screenings, when in effect, were "controlled or required by" Amazon because the security screenings were mandatory, even if individual employees could make decisions that would minimize the length of time they were required to spend in security screening.  It is undisputed that when Chiu worked at a facility that required security screenings after clocking out (here, the Robbinsville facility), she was required to remain on Amazon's premises and undergo a security screening before being allowed to leave. (DSMF ¶ 6 ("[I]ndividuals who exited Fulfillment Centers equipped with security screening passed through security apparatus on the way out of the building."); PRSMF ¶ 6.)   The Robbinsville screening area consisted of eight metal detector lanes, three of which were "express

lanes" intended for individuals not carrying any metal objects or personal belongings.  (DSMF ¶ 8.)  Employees often passed through the express lanes "in seconds . . . without stopping."  (*Id.*)  The remaining lanes consisted of "Divesting Lanes" with sloping tables for employees to slide down any personal belongings while the employee passed through a metal detector; and later, one lane with an X-ray conveyor belt for bag screening.  (*Id.* ¶ 10.)  Employees could "choose which metal detector to use" depending on whether they brought personal belongings with them.  (*Id.* ¶ 8.)

Amazon argues that it "has not 'required' *anyone* to undergo any sort of delay" because employees could choose not to bring personal items and thereby pass through security "without stopping" by using the express lanes.  (DSMF ¶ 8; ECF No. 100-1 at 7.)  But Amazon is conflating the amount of time spent in security screening with whether the screening itself is mandatory.  Even if Chiu was able to pass through the express lanes "without breaking stride," Chiu was still undergoing a security screening.  (*See* ECF No. 100-1 at 7.)  A reasonable jury could find that Amazon required Chiu to undergo a security screening even if Chiu had some ability to influence *how long* the screening lasted.

This reasoning comports with the Court's previous decision denying judgment on the pleadings on behalf of Amazon.  The Court held that it could be reasonably inferred that "Plaintiff may not leave the 'control' of Amazon, and thereby complete her shift for the day, without undergoing the security screening, thus satisfying the first prong."  (ECF No. 42 at 9.)  "Plaintiff does not appear to have a choice in the matter: at the end of the work day, it is necessary for her to undergo a mandatory security screening before she can physically exit Amazon's premises."  (*Id.*)  In a footnote, the Court noted that at the preliminary stage, it could not consider Amazon's statements in its Answer explaining that employees who chose not to bring personal belongings

could "pass through screening without stopping" using express lanes. (*Id.* at 9 n.2.) The Court stated that these facts, "if proven to be true, may serve to show that Amazon 'requires' its employees to spend very little time on long security lines." (*Id.*) This sentence, however, does not necessitate summary judgment in favor of Amazon now that Amazon has submitted evidence that employees could minimize their time undergoing security screening. The Court does not interpret this footnote as a definitive statement regarding liability. A reasonable jury may find that any length of time spent in security screening was "required" by Amazon, even if that length of time amounts to very little.[10]

Again, the crux of Amazon's argument is that because an employee could minimize their time spent in security screening by choosing not to carry personal belongings, any additional time spent in security screening was "voluntary" and therefore not "required" or primarily for Amazon's benefit. (*See* ECF No. 100-1 at 19.) But even accepting Amazon's argument at face value—that an employee's ability to minimize the length of the screening means that the screening was not "required"—there remains a material dispute as to whether the length of the screening was solely attributable to the employees' "personal decisions." (*See id.*)

Indeed, the record demonstrates that whether an employee was subject to a secondary screening was not always entirely attributable to the employee's choice to carry personal items. For example, the first time that Chiu set off a metal detector and was required to undergo secondary screening, she "didn't realize" that she was carrying coins in her pocket. (*See* ECF No. 100-4 at 26, 102:17-24.) Chiu did not testify that she chose to carry personal belongings that she knew would extend her screening time. She mistakenly carried loose change, and as a result, she was directed by security officers to "wait on the side" and was unable to leave until she completed the

---

[10]    The Court addresses the *de minimis* doctrine herein at Section III.C.2.

secondary screening process.  (*Id.* at 102:2-7.)  Amazon is correct that Chiu mistakenly carrying loose change was "not something Amazon controlled or required"—but subjecting Chiu to primary and secondary security screenings *is* controlled and required by Amazon.  (*See* ECF No. 100-1 at 19.)  A reasonable jury could find that Chiu did not *choose* to spend this additional time in security screening, and that the screening was "required" by Amazon.

Similarly, Chiu testified that when she set off a metal detector and underwent secondary screening on a second occasion, she did not remember what she was carrying but "didn't understand why [she] was stopped because [she] had nothing in [her] pockets."  (ECF No. 100-4 at 27-28, 103:21-104:11.)  Nevertheless, the security personnel "told [her] to go to the side and that's what [she] did."  (*Id.*)  When a security officer conducted a secondary screening with a handheld "metal detector wand," they "didn't find anything, so they just let [her] go."  (*Id.*)[11] Chiu's testimony demonstrates that even when employees have attempted to remove all personal belongings but set off a metal detector for no apparent reason, Amazon may still require them to remain on the premises to conduct further screening.  Indeed, Amazon's screening policies dictate

_____

[11]     Amazon argues that Chiu's testimony, "even viewed in the light most favorable to her," does "not create a triable issue for summary judgment" because she testified that she did not remember what she was carrying.  (ECF No. 108 at 8 n.1.)  The Court disagrees and finds that a fair reading of Chiu's testimony, when viewed in a light most favorable to her, shows that she believes that a second incident occurred and that there was no apparent reason for the secondary screening on that occasion.  The cases cited by Amazon for the proposition that a "failure to recall" does not create a triable issue of fact are inapposite.  *See, e.g., Bixler v. Cent. Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1301-02 (3d Cir. 1993) (finding no genuine dispute of material fact where, when the plaintiff was asked whether she remembered an event, she testified, "I don't. I really don't."); *Tinder v. Pinkerton Security*, 305 F.3d 728, 735-36 (7th Cir. 2002) (finding no genuine dispute where uncontroverted evidence indicated that a plaintiff had received a document and the plaintiff testified that she did "not remember receiving or seeing" the document); *Wagner v. Unison Admin. Servs., LLC*, Civ. No. 07-1008, 2009 WL 891870, at *8 (W.D. Pa. Mar. 31, 2009) (finding no genuine dispute where a plaintiff testified that he did not recall receiving an entire life insurance application against "unrebutted evidence" that he had received it).

that after an employee sets off a metal detector during a primary screening, if the secondary screening does not detect anything on the employee's person, the employee is allowed to leave the facility.  (*See* ECF No. 107-3 at 14, 46:21-47:19.)  If the wand continues to activate during the secondary screening process and neither the employee nor the security officer can identify what is triggering the metal detector, employees are required to fill out a "Failure to Clear a Screening" form before leaving the facility.  (*Id.* at 47:24-49:1.)  Amazon's own screening procedures leave open the possibility that an employee may be subject to additional screening procedures that are beyond the employees' control and even if there is no apparent reason that they triggered the metal detectors.

Finally, Chiu testified that although it only took her about "three seconds" to pass through the express lanes, it "depended on whether there was a line," because if there were other employees waiting to pass through the express lanes in front of Chiu, it could take her an additional "three to four" seconds to pass through security.  (ECF No. 100-4 at 33-34, 115:14-116:2.)  Even if Amazon presented employees with different options to influence the amount of time they would spend undergoing security screening, a reasonable jury could find that any time spent undergoing security screenings was "required" by Amazon.

In support of its argument that Chiu's additional time spent in security screening was not compensable because it resulted from her personal choices, Amazon cites several cases holding that time spent donning and doffing work uniforms was not compensable where the employees were given the choice to change in and out of their uniforms at home.  (*See* ECF No. 108 at 9-10 (citing *Bamonte v. City of Mesa*, 598 F.3d 1217, 1225-26 (9th Cir. 2010); *Rosano v. Twp. of Teaneck*, Civ. No. 09-6339, 2012 WL 13050594, at *10-11 (D.N.J. Dec. 28, 2012)).)  The present case is distinguishable from those cited by Amazon.  In *Bamonte*, for example, employee police

officers had the option of donning and doffing their uniforms either at the workplace or in their homes, but were not compensated for such time.  598 F.3d at 1225.  The United States Court of Appeals for the Ninth Circuit held that because the employees were not required for any job-related reason to change into their uniforms at work, the act of donning and doffing their uniforms was not "integral and indispensable" to their job, "i.e., 'necessary to the principal work performed and done for the benefit of the employer,'" under the Portal-to-Portal Act.  *Id.*  Therefore, the activity was excluded from compensability under the Fair Labor Standards Act (FLSA) as "preliminary" and "postliminary" activity under the Portal-to-Portal Act.  *Id.*  The Ninth Circuit distinguished *Bamonte* from other cases in which the donning and doffing of gear was considered "integral and indispensable" because it was required to occur at the workplace's premises "by law, by rules of [the employer], and by the nature of the work," such as for serious health and safety concerns.  *Id.* at 1225-26.  But in the absence of a "law, rule or regulation mandating on-premises donning and doffing," the plaintiffs were merely seeking "that they be compensated because of their preference to don and doff at the workplace."  *Id.* at 1225-27.  *See also Rosano*, 2012 WL 13050594, at *10 (finding that because the plaintiffs "conceded that 'there is no reason they cannot don . . . their entire uniform at home,'" and "because the option to change at work benefits the plaintiffs, not [the defendant], these activities are preliminary and postliminary to the principal activity of police work and therefore are non-compensable under the FLSA").

Here, by contrast, the Court has found that the NJWHL does not incorporate the Portal-to-Portal Act's exclusion of preliminary and postliminary activities from compensability.  (ECF No. 42 at 10-13.)  The only relevant question, therefore, is whether Amazon "required and controlled" the security screenings, and whether the screenings were primarily for Amazon's benefit.  (*See id.*)  Amazon argues that *Bamonte* and *Rosano* are persuasive even though they are governed by the

Portal-to-Portal Act because part of the legal analysis considered whether the activity at issue was "for the benefit of the employer." (ECF No. 108 at 9.) But the Court is not convinced that the facts and legal issues are analogous. Although the police officers in *Bamonte* and *Rosano* were required to wear uniforms, they were not required to spend the time changing into their uniforms at the workplace. By contrast, Amazon employees do not "have a choice in the matter: at the end of the work day, it is necessary for [plaintiffs] to undergo a mandatory security screening before [they] can physically exit Amazon's premises." (ECF No. 42 at 9.) An employee's decision not to carry their personal belongings does not exempt them from a security screening, but merely minimizes the likelihood that they will have to spend more than a few seconds undergoing a screening. Moreover, there is a genuine dispute as to whether employees may be subject to additional screening procedures that are beyond the employees' control regardless of their decision to carry personal belongings.

Amazon further argues that any additional time spent in security screening was not primarily for Amazon's benefit because any delay resulted from the employee's choice to carry personal items for the employee's benefit. (*See* ECF No. 100-1 at 19.) But Amazon's Rule 30(b)(6) designee testified that the security screenings have several purposes, all of which a reasonable jury could find are primarily for Amazon's benefit. The witness testified, for example, that the "most obvious" purpose of the exit screening procedures "is . . . preventing loss of inventory . . . and loss of data," in addition to "provid[ing Amazon] with some protection against the movement of items through our warehouse that we would not want to be moving through our warehouse," such as "controlled or undesirable substances, dangerous substances, and, of course, weapons." (ECF No. 107-3 at 39-40, 149:12-150:22.) A reasonable jury could find that the *security screenings* primarily benefited Amazon to prevent loss and the removal of anything

36

dangerous or illegal from its facilities, even if some of the *procedures* minimizing the time spent in security screening primarily benefit employees.

Finally, contrary to Amazons' arguments, the United States Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) does not necessitate summary judgment in Amazon's favor. The Court in *Anderson* held that "the time spent walking from timeclocks to work benches" after employees had clocked in was found compensable under the FLSA. *Id.* at 691-93. Amazon emphasizes the Court's observation that compensable working time should be "limited to the minimum time necessarily spent in walking at an ordinary rate along the most direct route from time clock to work bench," and not when employees take "roundabout journeys and stop[] off en route for purely personal reasons." *Id.* at 692. (ECF No. 100-1 at 21-22.) Amazon analogizes its employees who decide to carry personal items to the workers in *Anderson* who took "roundabout journeys." (*Id.*) But the Court in *Anderson* reasoned that the "arrangements in this case compelled the employees to spend an estimated 2 to 12 minutes daily, if not more, in walking on the premises," and that such "time was under the complete control of the employer, being dependent solely upon the physical arrangements which the employer made in the factory." *Id.* at 691. Here, Chiu, when subject to security screenings at the Robbinsville facility from August 2016 to April 2017, was required by Amazon to clock out before security screenings "solely upon the physical arrangements" of the FC. It is undisputed that Chiu was subject to security screenings during her employment at the Robbinsville facility, even if the record suggests that she could influence the amount of time she spent in screening by deciding not to carry personal items. (*See* DSMF ¶¶ 1-3, 6-8.)

Accordingly, a reasonable jury could find that time spent undergoing mandatory security screenings at the end of the workday must be counted towards "hours worked" under the NJWHL

because such screenings were ultimately required and controlled by Amazon, even if Chiu could take steps to minimize the likelihood that she would have to spend more than a few seconds undergoing the screening.  Summary judgment on this basis is therefore inappropriate.

### 2. The De Minimis Doctrine

Finally, the Court is not convinced that the NJWHL provides a *de minimis* defense to Chiu's claim for unpaid security screenings.

First, Amazon argues that when interpreting the NJWHL, the Court should look to the *de minimis* exception set forth under the FLSA by the United States Supreme Court in *Anderson* and apply the exception to the NJWHL.  (ECF No. 100-1 at 23.)  In *Anderson*, the Supreme Court held:

> The workweek contemplated by [the FLSA] must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

[328 U.S. at 692-93.]

Neither the New Jersey Supreme Court nor any of New Jersey's lower courts have applied the common law *de minimis* doctrine to otherwise compensable work.  The NJWHL does not contain an express *de minimis* exception, nor have New Jersey courts addressed whether the NJWHL incorporated the FLSA's *de minimis* exception.  When presented with an issue of state law that has yet to be definitively interpreted by the New Jersey courts, "the role of a federal court ruling on a matter of state law . . . is to follow the precedents of the state's highest court and predict how that court would decide the issue presented." *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3d Cir. 2001).  And as this Court has previously noted, the New Jersey Supreme Court has made clear that when interpreting a statute and its regulations,

the "paramount goal" is to "determin[e] the intent of the drafter." (ECF No. 42 at 6-7 (citing *US Bank, N.A. v. Hough*, 42 A.3d 870, 877 (N.J. 2012); *DiProspero v. Penn*, 874 A.2d 1039 (N.J. 2005)). The statute and implementing regulations "should be construed in accordance with the plain meaning of its language . . . and in a manner that makes sense when read in the context of the entire regulation." *Czar, Inc. v. Heath*, 939 A.2d 837, 840 (N.J. Super. Ct. App. Div. 2008) (citations omitted), *aff'd as modified*, 966 A.2d 1008 (N.J. 2009). Furthermore, "[o]nly when a fair 'reading of the enactment leads to more than one plausible interpretation' do[es] [the court] look to extrinsic evidence." *US Bank*, 42 A.3d at 877 (quoting *Bedford v. Riello*, 948 A.2d 1272, 1280 (N.J. 2008)).

Accordingly, the Court must first look to the plain language of the NJWHL and its implementing regulations and determine whether a "fair 'reading of the enactment leads to more than one plausible interpretation'" before looking to the FLSA for guidance. *US Bank*, 42 A.3d at 877 (quoting *Bedford*, 948 A.2d at 1280). As noted above, the NJWHL requires New Jersey employers to pay their employees "for all hours worked." N.J.A.C. 12:56-5.1. Additionally, the stated purpose of the NJWHL was "to establish a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to their health, efficiency and well-being." N.J. Stat. Ann. § 34:11–56a. Indeed, the purpose of the NJWHL is to "protect employees from unfair wages and excessive hours." *In re Raymour & Flanigan Furniture*, 964 A.2d 830, 836 (N.J. Super. Ct. App. Div. 2009). "The remedial purpose of the [NJWHL] dictates that it should be given a liberal construction." *New Jersey Dep't of Labor v. Pepsi-Cola Co.*, 170 N.J. 59, 62 (2001). Indeed, the New Jersey Supreme Court has held that although the FLSA influenced the NJWHL when it was adopted in 1966, courts

should not ignore provisions of the NJWHL's implementing regulations that provide broader protection than the FLSA because the NJWHL was passed "to protect workers not covered by [the] FLSA." *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 463 (N.J. 2015).

The Pennsylvania Supreme Court's recent decision declining to apply the FLSA's *de minimis* exception to Pennsylvania's wage-and-hour law, the Pennsylvania Minimum Wage Act (PMWA), is instructive here. *See Heimbach v. Amazon, Inc.*, 255 A.3d 191 (Pa. 2021). In *Heimbach*, the Pennsylvania Supreme Court noted that after the *Anderson* decision, "the United States Department of Labor issued an interpretative regulation, 29 C.F.R. § 785.47, setting limits on an employer's use of the *de minimis* doctrine . . . under the federal FLSA." *Id.* at 206. Further, the Pennsylvania Supreme Court highlighted *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), where the United States Supreme Court "signaled its possible discomfort with the continuing application of the *de minimis* exception to cases brought under the" FLSA and held that a "*de minimis* doctrine does not fit comfortably within . . . [the FLSA,] which, it can fairly be said, is *all about trifles*—the relatively insignificant periods of time in which employees wash up and put on various items of clothing needed for their jobs." *Heimbach*, 255 A.3d at 207-08 (quoting *Sandifer*, 571 U.S. at 234). Given the United States Supreme Court's "view of the relevance of the *de minimis* doctrine in the interpretation of the federal FLSA," together with the PMWA's plain text, legislative purpose, and the fact that the Pennsylvania courts have "*never* utilized this doctrine to interpret any provisions of the PMWA," the Pennsylvania Supreme Court declined to apply a *de minimis* exception to the PMWA. *Id.* at 208.

Here, the Court finds *Heimbach*'s reasoning persuasive. The Court is not convinced that the plain meaning of the NJWHL's language, when read in the context of the entire statute and its implementing regulations, could plausibly be interpreted to include the FLSA's *de minimis*

exception as set forth in *Anderson*. Additionally, neither the New Jersey legislature nor the New Jersey Commissioner of Labor have incorporated the FLSA's *de minimis* exception into the NJWHL even though it was enacted after the *Anderson* decision and the passing of 29 C.F.R. § 785.47. As this Court previously noted, the NJWHL and its regulations expressly refer to specific provisions of the FLSA,[12] so "the fact that the New Jersey legislature 'expressly adopted some federal regulations indicates that its failure to adopt others was intentional.'" (ECF No. 42 at 12-13 (citing *Integrity Staffing Sols., Inc. v. Busk (Busk II)*, 905 F.3d 387, 402 (6th Cir. 2018)).) And Amazon has not provided, nor is the Court aware of, any decision resorting to the FLSA for guidance on whether a *de minimis* exception should apply to the NJWHL, even where courts have considered claims for unpaid overtime under both the FLSA and the NJWHL. *See, e.g.*, *Genarie v. PRD Mgmt., Inc.*, Civ. No. 04-2082, 2006 WL 436733, at *12-13 (D.N.J. Feb. 17, 2006) (employing a three-part test to determine whether the plaintiffs' claims under the FLSA were *de minimis*, but not for the plaintiffs' claims under the NJWHL).

Amazon separately argues that "New Jersey law has long recognized the *de minimis* rule at common law and it was a well-established background principle at the time of the NJWHL's adoption." (ECF No. 100-1 at 24 (citing *Schlichtman v. New Jersey Highway Auth.*, 579 A.2d 1275, 1279 (N.J. Super. Ct. Law Div. 1990)).) Amazon contends that it would have been unnecessary for the New Jersey Legislature to expressly adopt a *de minimis* exception under the NJWHL because the doctrine already exists in the common law, and that the NJWHL should not be construed to alter the common-law *de minimis* doctrine because it did not expressly do so. (ECF No. 100-1 at 25.)

---

[12] *See, e.g.*, N.J. Stat. Ann. § 34:11-56a4 (citing to "Section 6 of the federal "Fair Labor Standards Act of 1938'"); N.J.A.C. 12:56-7.2(a) (citing to "29 C.F.R. Part 541").

New Jersey courts, however, have never applied the common-law *de minimis* doctrine to the NJWHL.  Based on the lack of New Jersey authority that directly controls the specific circumstances, the Court is disinclined to hold, for the first time, that either New Jersey's common-law *de minimis* doctrine or the FLSA's *de minimis* exception would apply to otherwise-compensable time under the NJWHL.  The Court, sitting in diversity, is guided by the admonitions of the Third Circuit, which caution that novel expansions of New Jersey's common law should ordinarily be left to New Jersey's Supreme Court unless there is sound reason to believe the expansion was foreshadowed by existing precedent.  *See Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (noting that federal courts "may not impose [their] own view of what state law should be.").  The Court is not aware of any authority demonstrating that the application of a *de minimis* doctrine to the NJWHL is necessarily foreshadowed.  Moreover, the doctrine is inconsistent with the plain language of the statute and its regulations, which require compensation "for all hours worked."  N.J.A.C. 12:56-5.1.  Other courts have refused to apply the *de minimis* doctrine where their respective state wage-and-hour laws similarly require compensation for "all hours" worked.  *See, e.g.*, *Heimbach*, 255 A.3d at 208-09 (declining to apply Pennsylvania's common-law *de minimis* exception to the PMWA, which "plainly and unambiguously requires payment for 'all hours worked'"); *Troester v. Starbucks Corp.*, 421 P.3d 1114, 1120-22 (Cal. 2018) (declining to apply California's common-law *de minimis* exception under the specific facts of the case in part because California's laws, which require payment "for all hours worked," are "indeed concerned with 'small things'").  Nor is the Court convinced by Amazon's argument that the location of the phrase "all hours worked" in one of the NJWHL's implementing regulations, as opposed to the statute itself, is dispositive.  "A violation of the [NJWHL] shall occur when an employer . . . violates any provision of this chapter or of any order issued under this chapter."

N.J.A.C. 12:56-1.2(a)(8); *see also Merlo v. Fed. Express Corp.*, Civ. No. 07-4311, 2010 WL 2326577, at *10 (D.N.J. May 7, 2010) (holding that a "violation of the NJWHL's implementing regulations constitutes a violation of the" NJWHL) (citing N.J.A.C. 12:56-1.2(a)(8))).

Having examined the relevant language of the NJWHL and its regulations, and having considered analogous decisional law for guidance, the Court declines to hold that the New Jersey Supreme Court would apply a *de minimis* doctrine to the NJWHL and denies Amazon's Motion for Summary Judgment on this basis.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Amazon's Motion to Dismiss is **GRANTED**; Plaintiff's Motion for Class Certification is **DENIED**; and Amazon's Motion for Summary Judgment is **DENIED**. An appropriate Order follows.

Dated: October 30, 2024

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**